**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| INDURA S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:10CV457 |
| | ) | |
| ENGINEERED CONTROLS INTERNATIONAL | ) | |
| INC. t/d/b/a REGO®, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The above-captioned case comes before the undersigned United States Magistrate Judge for a recommended ruling on Defendant's Motion for Summary Judgment (Docket Entry 30), pursuant to this Court's Amended Standing Order 30 (see Docket Entry 10) and 28 U.S.C. § 636(b)(1)(B), as well as for disposition of Defendant's Motion to Strike Expert Reports and Opinions (Docket Entry 19) and Defendant's Motion to Strike Rebuttal Expert Reports and Opinions (Docket Entry 25), pursuant to 28 U.S.C. § 636(b)(1)(A). (See Docket Entry dated August 1, 2011.) For the reasons that follow, Defendant's Motion to Strike Expert Reports and Opinions (Docket Entry 19) will be denied, Defendant's Motion to Strike Rebuttal Expert Reports and Opinions (Docket Entry 25) will be granted, and a recommendation will be made that the Court deny Defendant's Motion for Summary Judgment (Docket Entry 30).

## BACKGROUND

This case arises from a Complaint, which identifies Plaintiff Indura S.A. as a Chilean corporation that, inter alia, "provided liquid oxygen systems" to clients, including (as of November 1,

2006) Trusal S.A., a Chilean corporation that "owned and operated a fish hatchery and farm located . . . [in] Chile . . . ." (Docket Entry 1, ¶¶ 1-4.) According to the Complaint, Defendant Engineered Controls International Inc. ("ECII") is a Delaware corporation with its principal place of business in Elon, North Carolina, that (at the time of the events alleged in the Complaint) "engaged in the business, inter alia, of designing, manufacturing, testing, inspecting, selling, distributing and/or supplying valves for industrial use, . . . [including 'the Subject Valve,'] a liquid oxygen check valve bearing markings and/or having a model No. BK8508T 0605 AB3 600 CWP . . . ." (Id., ¶¶ 5, 6.)

The Complaint further alleges that "the Subject Valve was distributed, sold and/or supplied to a Chilean distributor of [Defendant ECII's] products, Influid, which, in turn, sold and/or supplied the Subject Valve to [Plaintiff] Indura, which then installed the Subject Valve at Trusal's [Chilean] fish farm for use in a system that supplied oxygen to various ponds in which Atlantic salmon fry were fattened and matured." (Id., ¶ 9.) According to the Complaint:

> On or about Sunday, June 29, 2008, Trusal employees at [said] fish farm observed Atlantic salmon fry surfacing and gasping for oxygen in one or more of the ponds.
>
> Upon investigation, Trusal employees observed that the [Subject] Valve had malfunctioned and was preventing the proper and adequate flow of liquid oxygen . . . ultimately causing the death by asphyxiation of over 4.3 million Atlantic salmon fry destined for sale to the domestic and international market.
>
> . . . .

. . . Trusal presented a claim to [Plaintiff] Indura for . . . in excess of $1.85 million. [Plaintiff] Indura and Trusal reached an agreement . . . that called for a payment by [Plaintiff] Indura to Trusal in the fair and reasonable amount of $1.85 million in settlement of all claims by Trusal against [Plaintiff] Indura.

(Id., ¶¶ 10, 11, 14 (internal paragraph numbers omitted).)[1]

Based on the foregoing allegations, the Complaint sets forth the following six separate causes of action against Defendant ECII:

1) contribution ("pursuant to N.C. Gen. Stat. § 1B-1 et seq.") (Docket Entry 1, ¶¶ 15-19);

2) common law indemnity (id., ¶¶ 20-22);

3) negligence (id., ¶¶ 23-26);[2]

---

[1] Defendant ECII does not dispute the basic historical facts alleged by Plaintiff Indura, i.e., that Defendant ECII manufactured the Subject Valve, which Plaintiff Indura purchased from a distributor (Influid) and incorporated into an oxygenation system at Trusal's fish farm in Chile, and that a failure thereafter occurred in said system. (See Docket Entry 31 at 2-3.)

[2] The Complaint identifies these alleged forms of negligence:

(a) Selling, supplying and/or distributing a dangerous and defectively designed, manufactured, and/or assembled product which [Plaintiff ECII] knew or should have known created an unreasonable risk of harm to the property of others;

(b) Failing to adequately, properly and safely design, manufacture, assemble, inspect and/or test the Subject Valve;

(c) Failing to design, manufacture, assemble, inspect and/or test the Subject Valve in accordance with accepted industry standards, recommended practices and/or applicable codes;

(d) Failing to warn end users of the aforesaid defective condition of the Subject Valve and/or to provide other warnings necessary for the safe and effective use of the Subject Valve; [and]

(e) Otherwise failing to use due care as may be disclosed during the course of discovery.

(Docket Entry 1, ¶ 25.)

4) breach of express warranties "of merchantable quality and . . . fit[ness] for the ordinary purposes associated with [the Subject Valve]" (id., ¶¶ 27-32);

5) breach of implied warranty of merchantability (id., ¶¶ 33-37); and

6) breach of implied warranty of fitness for a particular purpose (i.e., the Subject Valve's "use as part of a cryogenic oxygen system for use at the Trusal facility") (id., ¶¶ 38-42).[3]

After Defendant ECII answered (Docket Entry 6), the parties submitted a joint, proposed scheduling order (Docket Entry 11), which the Court adopted with minor clarifications (Docket Entry 12). Under the resulting Scheduling Order, the deadline for "[a]ll discovery" fell on April 29, 2011 (Docket Entry 12 at 1) and "[r]eports from retained experts under Rule 26(a) of the Federal Rules of Civil Procedure [we]re due . . . [f]rom Plaintiff [Indura] by: February 1, 2011 . . . [and] [f]rom Defendant [ECII] by: March 4, 2011" (Docket Entry 11 at 2 (emphasis added); see also Docket Entry 12 at 1 (making no modification to parties' joint proposal on expert report deadlines)). Following the adoption of the Scheduling Order, the Clerk set the case for trial during the Court's October 2011 Master Calendar session. (Docket Entry 14.)

On April 15, 2011, Defendant ECII moved "to strike the expert reports and opinions of Plaintiff Indura . . . [because Plaintiff

_____

[3] Apart from the claim for contribution (which cites a North Carolina statute), none of the causes of action references any statutory or other specific legal basis. (See Docket Entry 1, ¶¶ 20-42.)

Indura] failed to designate any experts by the February 1[, 2011] deadline . . . ." (Docket Entry 19 (hereinafter, "First Motion to Strike") at 1-2.) The First Motion to Strike asserts that, when Defendant ECII "served its expert disclosures by the March 4, 2011 deadline . . ., [it] noted that [Plaintiff] Indura had failed to designate experts as required by Rule 26 and the Court's scheduling order . . . ." (Id. at 2.) According to the First Motion to Strike, "[b]y letter dated March 21, 2011 [Plaintiff] Indura responded, stating that it had, in fact, produced the reports of two experts, Manuel Patricio Jorquera Encina and Roberto Quintana, as part of its mandatory initial disclosures." (Id.)[4]

The First Motion to Strike further recites that:

> On April 6, 2011, [Defendant] ECII sent a letter to [Plaintiff] Indura explaining that the [Jorquera Encina and Quintana] reports [Plaintiff Indura] referenced were insufficient because, among other reasons, they (1) were provided in response to document requests that specifically asked for the reports; (2) were prepared in 2008 in connection with the proceedings in Chile and were never identified as [Plaintiff] Indura's expert disclosures; (3) were in foreign language; and (4) did not include significant information required by Rule 26.

(Id. at 3.) Defendant ECII concluded its First Motion to Strike by contending that Plaintiff Indura took insufficient steps "to cure the many defects in its purported expert disclosures . . . [and thus] has failed to adhere to Rule 26 and this Court's scheduling order . . . [such that] the Court should strike [Plaintiff]

---

[4] Jorquera Encina is a "materials scientist" who has opined about the Subject Valve's alleged defectiveness. (Docket Entry 36 at 16; see also 36-1.) Quintana is an "accountant" with opinions about damages, not product defect issues. (Docket Entry 27 at 3.)

Indura's purported expert reports and opinions and preclude [Jorquera Encina and Quintana] from testifying at trial." (Id.) Plaintiff Indura responded in opposition (Docket Entry 27) and Defendant ECII filed a reply (Docket Entry 29).

During the course of the foregoing briefing, on Friday, April 29, 2011 (the deadline for the close of all discovery), Defendant Indura "move[d] the Court for entry of an order extending the deadline for discovery in this case by two weeks, to and including May 13, 2011." (Docket Entry 21 (hereinafter, "Discovery-Extension Motion") at 1.)[5] As support for its Discovery-Extension Motion, Plaintiff Indura stated that "depositions of two [of Plaintiff Indura's] witnesses were noticed by [Defendant] ECII, . . . [but] [b]ecause of scheduling conflicts . . . these witnesses [we]re not able to appear for their depositions within the original discovery period. The witnesses d[id], however, anticipate being available for depositions in Greensboro during the first two weeks of May 2011." (Id. at 1-2.) Plaintiff Indura further reported that it "consulted with [Defendant] ECII prior to filing [the Discovery-Extension Motion], and [Defendant] ECII indicated that it had no objection to the requested 2-week extension." (Id. at 2.)

On Monday, May 2, 2011, Defendant ECII filed a response in which it acknowledged that, prior to Plaintiff Indura's filing of the Discovery-Extension Motion, Defendant ECII "informed [Plaintiff Indura] that if [Plaintiff Indura] could confirm that both

---

[5] The electronic time-stamp associated with the Discovery-Extension Motion reflects that Plaintiff Indura filed it at 3:05 p.m.

witnesses [referenced in the Discovery-Extension Motion] were available and would appear for their depositions, [Defendant ECII] would not object to a two-week extension of the discovery period so that [Plaintiff Indura] could meet its obligation to produce the witnesses." (Docket Entry 22 at 2.) However, according to Defendant ECII, "[o]n the evening of April 29, 2011 – after the close of business on the day discovery in this case ended and after [Plaintiff Indura] had filed its [Discovery-Extension Motion] – [Plaintiff Indura] purported to serve by e-mail the rebuttal report of a new expert . . . ." (Id. at 3.) Defendant ECII deduced from this course of events "that [Plaintiff Indura] planned to use the requested extension [of the discovery period] as a way to serve an additional expert report . . . ." (Id.) Moreover, Defendant ECII reported that, had it known of Plaintiff Indura's alleged plan in this regard, Defendant ECII "would have objected to [the Discovery-Extension Motion]." (Id.)

Accordingly, Defendant ECII "withdr[ew] its consent and ask[ed] the Court to deny [the Discovery-Extension Motion] . . . [on the ground that Plaintiff Indura] should bear the consequences of its multiple discovery failures (namely, its failure to produce witnesses for their depositions and its failure to properly conduct expert discovery)." (Id. at 5.) Alternatively, Defendant ECII requested that "[i]f the extension [wa]s permitted . . . the Court . . . limit the extension to the purposes requested in [the Discovery-Extension Motion] – that is, the two depositions of the witnesses [referenced in the Discovery-Extension Motion] . . . ."

-7-

(Id.)  Plaintiff Indura declined to file a reply.  (See Docket Entry dated May 5, 2011.)

The Court agreed that Plaintiff Indura "should receive only the relief necessary to address matters set out in [the Discovery-Extension Motion], i.e., an opportunity to produce the two cited witnesses for depositions within two weeks after the close of discovery."  (Docket Entry 24 at 3.)  "However, the Court f[ound] no basis for declining [Plaintiff Indura's] request for a brief additional period of time to make its affiliated witnesses available for deposition by Defendant [ECII] . . . [because] Defendant [ECII] ha[d] not rebutted [Plaintiff Indura's] showing that good cause (in the form of scheduling conflicts) warranted allowance of the depositions in question during the two-week period immediately following the close of discovery."  (Id. at 3-4.)  The Court therefore ruled "that the previously-noticed depositions of two witnesses affiliated with Plaintiff [Indura] (referenced in [the Discovery-Extension Motion]) [could] occur on or before May 13, 2011[, but] . . . that the authorization of the two depositions in question after the close of discovery on April 29, 2011, d[id] not constitute an extension of the discovery period and d[id] not alter any other case management deadlines . . . ."  (Id. at 4.)

On May 6, 2011, Defendant ECII moved "to strike the rebuttal expert report and opinions of Plaintiff Indura . . . ."  (Docket Entry 25 (hereinafter, "Second Motion to Strike") at 1.)  In support of its Second Motion to Strike, Defendant ECII asserted that, "[o]n April 29, 2011, after the close of business on the day

discovery in this matter ended, [Plaintiff] Indura sent, by email, a purported rebuttal expert report of a new expert, Fernando Lorenzo." (Id. at 2.)  According to Defendant ECII, said "rebuttal expert report [wa]s untimely and violate[d] the Court's scheduling order, the Federal Rules of Civil Procedure, and the Court's Local Rules; moreover, the scheduling order does not permit rebuttal experts in any event."  (Id.)  Plaintiff Indura responded (Docket Entry 32) and Defendant ECII replied (Docket Entry 33).

Defendant ECII thereafter moved for summary judgment on the following grounds:

1) Plaintiff Indura "lost the [S]ubject [V]alve . . . before [Defendant] ECII had an opportunity to test or inspect [it] to challenge or disprove [Plaintiff] Indura's defect theory" (Docket Entry 30 at 2);

2) Plaintiff Indura "failed to properly designate a liability expert in support of its defect theory . . . [such that it] cannot establish legally sufficient evidence of a defect in the [Subject Valve] or of negligence on the part of [Defendant] ECII" (id.);

3) Plaintiff Indura "failed to make a prima facie products liability case" (id.);

4) Plaintiff Indura "failed to adequately support its breach of warranty claims" (id.); and

5) "[w]ithout underlying liability, [Plaintiff] Indura's contribution and indemnity claims necessarily fail" (id.).

Plaintiff Indura filed its response in opposition (Docket Entry 36) and Defendant ECII filed its reply (Docket Entry 37.)

DISCUSSION

First Motion to Strike

Defendant ECII has moved "to strike the expert reports and opinions of Plaintiff Indura . . . [because Plaintiff Indura] failed to designate any experts by the [Scheduling Order's] deadline as required by [Federal] Rule [of Civil Procedure] 26." (Docket Entry 19 at 1-2.) Plaintiff Indura has responded by asserting that it met its obligations under Federal Rule of Civil Procedure 26 and the Scheduling Order, but that, even if it did not, the Court should refrain from striking the expert reports and opinions of Jorquera Encina and Quintana. (See Docket Entry 27 at 5-10.) The Court concludes that Plaintiff Indura failed to make a proper, timely "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2) and this Court's Scheduling Order, but declines, under the circumstances of this case, to impose the sanction proposed by Defendant ECII.

*Failure to Make Proper, Timely "Disclosure of Expert Testimony"*

Since 1993, Federal Rule of Civil Procedure 26(a) has provided for a three-tier disclosure process (separate from the party-initiated discovery process) that "requires all parties (1) early in the case to exchange information regarding potential witnesses, documentary evidence, damages, and insurance, (2) at an appropriate time during the discovery period to identify expert witnesses and provide a detailed written statement of the testimony that may be offered at trial through specially retained experts, and (3) as the trial date approaches to identify the particular evidence that may

-10-

be offered at trial." Fed. R. Civ. P. 26 advisory committee's note, 1993 Amendment, Subdivision (a). "Unless the court orders otherwise, all disclosures under Rule 26(a) must be in writing, signed, and served." Fed. R. Civ. P. 26(a)(4).

The "Initial Disclosure" is codified at Federal Rule of Civil Procedure 26(a)(1), which generally mandates that "[a] party must make initial disclosures at or within 14 days after the parties' [Federal] Rule [of Civil Procedure] 26(f) conference . . . ." Fed. R. Civ. P. 26(a)(1)(C). The next disclosure phase, the "Disclosure of Expert Testimony," falls under Federal Rule of Civil Procedure 26(a)(2), which declares that, "[i]n addition to the disclosures required by [Federal] Rule [of Civil Procedure] 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A) (emphasis added). This written, signed, and served disclosure of the identity of a party's expert witnesses "must be accompanied by a written report — prepared and signed by the witness — if the witness is one retained or specially employed to provide expert testimony in the case . . . ." Fed. R. Civ. P. 26(a)(2)(B). "A party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).

The Federal Rules of Civil Procedure thus mandate that each party serve all other parties with a signed, written document disclosing the identity of any expert witness the serving party may use at trial, see Fed. R. Civ. P. 26(a)(2)(A), and, for any such

witness retained to give expert testimony, the serving party must include with its disclosure a written report signed by the expert witness, <u>see</u> Fed. R. Civ. P. 26(a)(2)(B). Moreover, under the express language of this Rule, the foregoing "Disclosure of Expert Testimony" must be "[i]n addition to the disclosures required by [Federal] Rule [of Civil Procedure] 26(a)(1)," Fed. R. Civ. P. 26(a)(2)(A), and must occur at the times directed by the Court, <u>see</u> Fed. R. Civ. P. 26(a)(2)(D).

Under the Scheduling Order in this case, "[r]eports from retained experts under Rule 26(a) of the Federal Rules of Civil Procedure [we]re due . . . [f]rom Plaintiff [Indura] by: February 1, 2011 . . . ." (Docket Entry 11 at 2; <u>see also</u> Docket Entry 12 at 1.) On March 4, 2011, Defendant ECII informed Plaintiff Indura that, in Defendant ECII's view, Plaintiff Indura had not complied with its foregoing deadline. (Docket Entry 19 at 2.) By letter dated March 21, 2011, Plaintiff Indura (through its counsel) disputed that contention, in pertinent part, as follows:

> [I]n reviewing your expert disclosures, I noted the comment that '[P]laintiff [Indura] chose not to make a designation' of experts in this case. This is, of course, incorrect. We produced as part of our initial disclosures many months ago the written, signed expert report of Manuel Patricio Jorquera Encina dated October 14, 2008, together with his resume . . . . Plaintiff [Indura] further reserves the right to call witnesses identified in its initial disclosures on the issue of damages. This would include, for example, the testimony of Roberto Quintana, of Quintana, Lopez, Donaghue & Gonzales, LLP, as per his signed, written report that was produced as part of our initial disclosures . . . .

(Docket Entry 20-3 at 2-3.)

Setting aside the fact that the Federal Rules of Civil Procedure require service of a signed, written "Disclosure of Expert Testimony" that is "[i]n addition to the disclosures required by [Federal] Rule [of Civil Procedure] 26(a)(1)," Fed. R. Civ. P. 26(a)(2)(A), the record reflects that Plaintiff Indura did <u>not</u> provide the expert reports of Jorquera Encina and Quintana to Defendant ECII (or designate said witnesses as experts under Federal Rule of Civil Procedure 26(a)(2)(A)) as part of Plaintiff Indura's "Initial Disclosure" under Federal Rule of Civil Procedure 26(a)(1)(A). Instead, pursuant to the requirement to identify "each individual likely to have <u>discoverable information</u> — along with the subjects of that information — that the disclosing party may use to support its claims," Fed. R. Civ. P. 26(a)(1)(A)(i) (emphasis added), Plaintiff Indura listed 24 individuals, including Jorquera Encina (of "IDIEM") and Quintana (of "Quintana, Lopez, Donahue & Gonzales, LLP") (Docket Entry 29-3 at 2-6),[6] and, pursuant to the requirement to provide "[a] copy — or a description by category and location — of all documents, electronically stored information, and tangible things that the disclosing party ha[d] in its possession, custody, or control and may use to support its claims," Fed. R. Civ. P. 26(a)(1)(A)(ii), Plaintiff Indura listed 25 items, including "IDIEM Report of October 15, 2008," "Quintana

---

[6] In the interest of clarity, this parenthetical citation and other such citations to exhibits the parties have appended to their filings utilize the document number and pagination appearing in the CM/ECF system for such materials (as reflected in each filed document's system-generated footer), rather than to any exhibit number or letter assigned to such materials by the parties or to internal pagination otherwise appearing within the materials.

Lopez Donaghue and Gonzales report dated May 12, 2009," and "IDIEM report dated October 12, 2008" (Docket Entry 29-3 at 7-8).

In so doing, Plaintiff Indura cited to an out-dated version of Federal Rule of Civil Procedure 26 and neither identified the "subjects of th[e] information," Fed. R. Civ. P. 26(a)(1)(A)(i), possessed by any listed witness, nor a "description by category and location," Fed. R. Civ. P. 26(a)(1)(A)(ii), of any listed document. (See Docket Entry 29-3 at 2-8.) Plaintiff Indura's "Initial Disclosure" thus did not notify Defendant ECII that Jorquera Encina and Quintana were expert witnesses on any particular subject or that the "IDIEM" reports and "Quintana Lopez Donaghue and Gonzales" report were expert reports about any particular subject. At most, Plaintiff Indura's "Initial Disclosure" conveyed to Defendant ECII that Jorquera Encina and Quintana were potential witnesses with knowledge of some type of discoverable information and that the entities with which they were affiliated had produced reports of some sort upon which Plaintiff Indura might rely for some purpose.

Defendant ECII thereafter served Plaintiff Indura with interrogatories and requests for production of documents, to which Plaintiff Indura responded on November 22, 2010. (See Docket Entry 20-2.) Defendant ECII's document requests (specifically, numbers 19 and 31) solicited "[t]he IDIEM report dated October 15, 2008, identified in [Plaintiff Indura's] Rule 26(a)(1) disclosures" (id. at 11), and "[t]he IDIEM report dated October 12, 2008, identified in [Plaintiff Indura's] Rule 26(a)(1) disclosures" (id. at 13). To each of those requests, Plaintiff Indura responded: "See response

to No. 1.  There are several dates on the report.  Plaintiff [Indura] has two reports from IDIEM and both versions are being produced in connection herewith." (Id. at 11, 13.)  Similarly, in document request number 21, Defendant ECII asked for "[t]he complete Quintana Lopez Donaghue and Gonzales report, identified in [Plaintiff Indura's] Rule 26(a)(1) disclosures." (Id. at 12.)  In response, Plaintiff Indura stated: "See response to No. 1." (Id.)

Defendant ECII's document request "No. 1" and Plaintiff Indura's related response (referenced in its above-quoted responses to document request numbers 19, 21, and 31) appeared as follows:

> 1.  All documents and tangible items identified in the responses to the foregoing interrogatories.
>
> RESPONSE: Objection.  See general objections, which are incorporated by reference.  Without waiving these objections, see documents and reports being produced in connection herewith. Investigation and discovery is continuing and this response will be supplemented as necessary.

(Id. at 8.)[7]  Nothing in Plaintiff Indura's production of the two "IDIEM" reports or the "Quintana Lopez Donaghue and Gonzales" report (in response to Defendant ECII's document requests) thus identified such production as Plaintiff Indura's "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2).

---

[7] The objections to which Plaintiff Indura expressly made its document request number 1 production subject (which same objections Plaintiff Indura appeared to incorporate into its response to document request numbers 19, 21, and 31) included:  1) attorney-client privilege and work-product doctrine (Docket Entry 20-2 at 1); and 2) inadmissible and irrelevant (id. at 2).  Plaintiff Indura has not explained why, if it intended its production of the "IDIEM" and "Quintana Lopez Donaghue and Gonzales" reports to serve as its "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2), it asserted such objections in response to Defendant ECII's document requests for said reports.  (See Docket Entry 27 at 1-12.)

Nor did Plaintiff Indura's accompanying answers to Defendant ECII's interrogatories clarify that Plaintiff Indura intended its foregoing document production to serve as its written, signed disclosure of Jorquera Encina and Quintana as its expert witnesses, with the two "IDIEM" reports and the "Quintana Lopez Donaghue and Gonzales" report as the accompanying expert reports of said witnesses, as required by Federal Rule of Civil Procedure 26(a)(2)(A) and (B). To the contrary, as shown in the discussion that follows, see infra, pp. 16-20, said interrogatory responses tended to suggest otherwise (particularly as to Jorquera Encina).

Defendant ECII's first interrogatory asked Plaintiff Indura to "[i]dentify . . . each and every person . . . who has or purports to have first-hand or personal knowledge of any facts and circumstances alleged in [the] Complaint . . . [and] the subjects on which he/she has or purports to have knowledge." (Docket Entry 20-2 at 4.) Plaintiff Indura answered: "See the various reports and documents being produced in connection herewith, together with plaintiff's initial Rule 26 Disclosures. The incident was investigated extensively by experts appointed by the Chilean court, by [Plaintiff] Indura, by [Plaintiff] Indura's insurer (ACE), by Trusal and by [D]efendant [ECII]." (Id.) At most, this response informed Defendant ECII that the authors of the "IDIEM" reports and the "Quintana Lopez Donaghue and Gonzales" report had or purported to have knowledge about matters alleged in the Complaint and that some unidentified experts conducted investigations into the underlying incident. Said response did not designate anyone (much

less Jorquera Encina or Quintana) as witnesses Plaintiff Indura "may use at trial to present evidence under Federal Rule of Evidence 702, 703, and 705," Fed. R. Civ. P. 26(a)(2)(A).

Next, in interrogatory number 2, Defendant ECII requested that Plaintiff Indura "identify, as specifically as possible, the manufacturing or design defect(s) [of the Subject Valve]" (Docket Entry 20-2 at 4) and Plaintiff Indura responded as follows:

> Discovery is continuing and [P]laintiff [Indura] does not yet have access to [Defendant ECII's] design drawings and manufacturing information that has been requested during discovery. Accordingly, this answer will be supplemented as part of expert disclosures at the completion of fact discovery.  By way of further response, please see the reports and documents being produced in connection herewith.  <u>The neutral expert appointed by the Chilean court determined</u>, based on the results of the joint investigation in which [D]efendant [ECII] participated, including testing of the subject valve, disassembly and inspection of the subject valve, interviews with relevant witnesses, and review of relevant documentation, <u>that the subject valve was defective in design and/or manufacture</u> and that this defect was responsible for the failure of the valve resulting in the death of the salmon at the Trusal facility.

(<u>Id.</u> (emphasis added).)

In its third interrogatory, Defendant ECII then solicited from Plaintiff Indura a description of "each and every fact or <u>opinion supporting</u>, evidencing, or indicating [Plaintiff Indura's] <u>contention that any such defect(s) exist(s)</u>, including the identity of each and every <u>person holding such opinion(s)</u> or fact(s)." (<u>Id.</u> (emphasis added).)  To answer, Plaintiff Indura stated only:  "See prior response."  (<u>Id.</u> at 5.)  In other words, when asked to identify any person who held an opinion supporting the position that the Subject Valve was defective, Plaintiff Indura referred

Defendant ECII generally to all the documents Plaintiff Indura produced in response to Defendant ECII's 49 requests for production of documents (see id. at 8-17) and singled out only "[t]he neutral expert appointed by the Chilean court" (id. at 4).[8]

Finally, in its tenth interrogatory, Defendant ECII requested:

> If [Plaintiff Indura] or any expert witness retained by [it] or anyone acting on [its] behalf ha[d] performed or conducted any inspections, testing, or evaluations of the [Subject Valve], state: the date and location of all inspections, testing, or evaluations performed; the type and purpose of each inspection, testing, or evaluation performed; the methods and procedures used for each inspection, testing, or evaluation; the factual results or data obtained during or as a result of each inspection, testing, or evaluation; the conclusions that have been drawn or reached as a result of the inspection, testing, or evaluation performed or conducted; and the names, positions, current addresses, and telephone numbers of all persons, firms, or corporations that directed, conducted, or assisted in or were present for the performance of each inspection, test, or evaluation.

(Id. at 6 (emphasis added).)

---

[8] Jorquera Encina was not "the neutral expert appointed by the Chilean court" (Docket Entry 20-2 at 4). (See Docket Entry 36 at 2 (acknowledgment by Plaintiff Indura that its "liability insurer, ACE, retained . . . Jorquera Encina").) Further, as noted in the Background section, see supra, p. 5 n.4, Quintana did not render any opinion about product defects and, moreover, he too was retained by Plaintiff Indura's insurer (see Docket Entry 20-5 at 2, 5). The Court also rejects Plaintiff Indura's conclusory suggestion that, because Jorquera Encina and Quintana originally were retained for the Chilean litigation, they come under Federal Rule of Civil Procedure 26(a)(2)(C), rather than Federal Rule of Civil Procedure 26(a)(2)(B) (see Docket Entry 27 at 10 n.11). See, e.g., Downey v. Bob's Discount Furniture Holdings, Inc., 633 F.3d 1, 7 (1st Cir. 2011) (observing that expert falls outside Federal Rule of Civil Procedure 26(a)(2)(B) only if "his opinion testimony arises not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation"); Skyeward Bound Ranch v. City of San Antonio, No. SA-10-CV-0316 XR, 2011 WL 2162719, at *2 (W.D. Tex. June 1, 2011) (unpublished) ("The advisory committee notes suggest [Federal] Rule [of Civil Procedure] 26(a)(2)(C) applies to treating physicians or other healthcare professionals and employees of a party who do not regularly provide expert testimony. Requiring less of an expert who is not retained or specially employed is logical because that type of witness usually has firsthand factual knowledge about the case.").

Plaintiff Indura replied: "See response to No. 9. Plaintiff [Indura] has not conducted testing, evaluation or inspection of the [S]ubject [V]alve since the date of the incident except as disclosed in the reports and documents being produced in connection herewith." (Id. at 7.) In its incorporated "response to No. 9" (id.), Plaintiff Indura stated: "See the reports and documents being produced in connection herewith regarding the persons known to [P]laintiff [Indura] to have participated in testing and/or handling the [Subject] [V]alve since the incident and the circumstances under which the [S]ubject [V]alve was handled." (Id. at 6.) Thus, again, Plaintiff Indura failed to designate in any affirmative way Jorquera Encina or Quintana as its expert witnesses for purposes of Federal Rule of Civil Procedure 26(a)(2)(A).

In sum, the foregoing circumstances reflect that, in its "Initial Disclosure" and responses to Defendant ECII's discovery requests, Plaintiff Indura did not properly disclose that Jorquera Encina and Quintana were expert witnesses it "may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705," Fed. R. Civ. P. 26(a)(2)(A), and/or that the "IDIEM" and "Quintana Lopez Donaghue and Gonzales" reports represented the "accompanying" expert reports of said witnesses, as required by Federal Rule of Civil Procedure 26(a)(2)(B). Plaintiff Indura has not identified any other written, signed, and served document dated on or before February 1, 2011, which disclosed to Defendant ECII that Jorquera Encina and Quintana were expert witnesses upon whom Plaintiff Indura might rely at trial, see Fed. R. Civ. P. 26(a)(2)(A), and

-19-

which was "accompanied by a written report — prepared and signed by [said] witness[es]," Fed. R. Civ. P. 26(a)(2)(B). (See Docket Entry 27 at 1-12.) The Court therefore finds that Plaintiff Indura did not comply with the deadline in the Scheduling Order for "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2) (including as to Jorquera Encina and Quintana).[9]

*Appropriate Sanction(s) for Non-Compliance*

"[T]he [C]ourt may issue any just orders, including those authorized by [Federal] Rule [of Civil Procedure] 37(b)(2)(A)(ii)-(vii), if a party or its attorney . . . fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1).[10] "Instead of

---

[9] In addition to complaining that Plaintiff Indura did not properly disclose Jorquera Encina and Quintana as expert witnesses in a timely fashion, Defendant ECII also briefly has argued that said witnesses' reports fail to include all the information required by Federal Rule of Civil Procedure 26(a)(2)(B) (see Docket Entry 20 at 11-12). To the extent those complaints relate to absent information about publications, prior testimony, and testimony rates, it appears that those issues have (or easily could have) been addressed without any lasting prejudice to Defendant ECII. (See id. at 12 (concession by Defendant ECII that Plaintiff Indura provided such information for Quintana); Docket Entry 29 at 3 (acknowledgment by Defendant ECII that Plaintiff Indura produced Jorquera Encina for deposition).) Defendant ECII's remaining arguments regarding the reports' alleged lack of factual support for conclusions and failure to specify the witnesses' precise trial testimony are wholly conclusory. (See Docket Entry 20 at 12.) The Court therefore will not consider such matters in determining whether to strike Plaintiff Indura's expert reports and opinions.

[10] The cross-referenced provisions of Federal Rule of Civil Procedure 37 identify these sanctions:

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(continued...)

or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses — including attorney's fees — incurred because of any noncompliance with [Federal Rule of Civil Procedure 16], unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 16(f)(2) (emphasis added).

Defendant ECII has argued that the Court should sanction Plaintiff Indura's failure to make a timely, proper "Disclosure of Expert Testimony" by "strik[ing] [its] purported expert reports and opinions and preclud[ing] its experts from testifying at trial." (Docket Entry 20 at 14-15.)  Plaintiff Indura has not disputed that, as a general matter, an order striking expert reports and testimony may serve as an appropriate sanction (or, in the words of the applicable Rule, a "just order[]," Fed. R. Civ. P. 16(f)(1)), to address a party's failure to comply with a scheduling order deadline for expert disclosures.  (See Docket Entry 27 at 5-12.) Moreover, both parties have agreed that Akeva L.L.C. v. Mizuno Corp., 212 F.R.D. 306, 311-12 (M.D.N.C. 2002), sets out the proper factors for the Court to consider in assessing sanctions for such non-compliance.  (Docket Entry 20 at 6-7; Docket Entry 27 at 6-10.)

---

[10](...continued)

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).

Said factors are:

1) "the explanation for the failure to obey the order," <u>Akeva</u>, 212 F.R.D. at 311;

2) "the importance of the expert opinion," <u>id.</u>;

3) "the prejudice to the opposing party by allowing the disclosures," <u>id.</u>;

4) "the availability of alternative or lesser sanctions," <u>id.</u>;

5) "the interest in expeditious resolution of litigation," <u>id.</u>;

6) "a court's need to manage its docket," <u>id.</u>; and

7) "public policy favoring disposition of cases on the merits," <u>id.</u>

In the discussion that follows, <u>see</u> <u>infra</u>, pp. 22-32, the Court examines how these factors relate to this case and then explains why, in their totality, such considerations do not warrant striking Plaintiff Indura's expert reports and opinions.

Explanation for Non-Compliance

In its brief opposing the instant First Motion to Strike, under the sub-heading "The explanation for the alleged failure to obey the order," Plaintiff Indura offered this argument:

> Dr. Jorquera's and Mr. Quintana's signed, written expert reports were, in fact, produced to [Defendant] ECII well in advance of any applicable discovery deadline. The issue is what relief might be appropriate, if any, where there was confusion over whether these experts might actually be called at trial as per their timely served reports. While [Plaintiff] Indura asserts that no remedy is justified under the facts presented here, striking these experts' reports is certainly not the remedy called for under these facts. As soon as [Plaintiff] Indura became aware of the claimed confusion, it promptly

> clarified the status of these witnesses, and there was
> more than ample time under the discovery schedule for
> [Defendant] ECII to have sought to supplement its expert
> reports if it felt the need to do so.    Instead,
> [Defendant] ECII simply filed the instant motion.

(Docket Entry 27 at 7 (internal citations and footnotes omitted).)

The Court concludes that, notwithstanding its sub-heading, this discussion does not set forth any "explanation" for Plaintiff Indura's failure to make a proper "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2) as to Jorquera Encina and Quintana.  Instead, said argument (and the argument within the omitted footnotes (see Docket Entry 27 at 7 nn.8, 9)) addresses the alleged lack of prejudice to Defendant ECII. Elsewhere in Plaintiff Indura's brief, however, this "explanation" does appear:  "[Plaintiff] Indura believed that it was in compliance with the Joint Rule 26 Report and scheduling orders applicable to this case and was genuinely surprised to learn of [Defendant] ECII's confusion about whether Dr. Jorquera and Mr. Quintana might testify as experts at trial as per their written, signed reports."  (Id. at 6.)

As documented above in detail, see supra, pp. 10-20, the record before the Court indicates that:

1) prior to the Scheduling Order's deadline, Plaintiff Indura never served Defendant ECII with a document that referenced Federal Rule of Civil Procedure 26(a)(2) or "Disclosure of Expert Testimony" (much less in relation to Jorquera Encina and Quintana);

2) Plaintiff Indura's "Initial Disclosure" under Federal Rule of Civil Procedure 26(a)(1)(A) neither identified Jorequera Encina

and Quintana as expert witnesses nor described the "IDIEM" and "Quintana Lopez Donaghue and Gonzales" reports as said witnesses' expert reports;

3) nowhere in Plaintiff Indura's responses to Defendant ECII's interrogatories and document requests did Plaintiff Indura clarify that Jorquera Encina and Quintana were expert witnesses retained to provide expert testimony at trial (about product defect issues and damages, respectively) and/or that the "IDIEM" and "Quintana Lopez Donaghue and Gonzales" reports constituted the "accompanying" written reports of said witnesses, as required by Federal Rule of Civil Procedure 26(a)(2)(A) and (B); and

4) when questioned directly about the identity of expert witnesses who supported its product defect theory, Plaintiff Indura pointed specifically only to a witness other than Jorquera Encina.

Given these circumstances, the Court cannot accept that Plaintiff Indura (and, more specifically, its counsel from a large, international law firm) plausibly believed it had made a proper "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2) as of February 1, 2011. Instead, the Court infers from this record that Plaintiff Indura engaged in a bit of tactical gamesmanship by choosing to rely on its dumping of all the materials from the prior Chilean litigation (including the "IDIEM" and "Quintana Lopez Donaghue and Gonzales" reports) on Defendant ECII, in lieu of making a straight-forward "Disclosure of Expert Testimony." This approach had the benefit (from Plaintiff Indura's perspective) of forcing Defendant ECII to speculate longer about

exactly what particular materials from the Chilean litigation Plaintiff Indura intended to utilize at trial (particularly as to product defect) and perhaps to incur greater litigation costs as a result. In addition, by refraining from an explicit designation of Jorquera Encina and Quintana, Plaintiff Indura gave itself the option of deferring any expense associated with formally arranging for their participation in the trial of this case.[11] At the same time, Plaintiff Indura knew that it could utilize its production of the "IDIEM" and "Quintana Lopez Donaghue and Gonzales" reports in discovery as a defense to any charge of non-compliance with the literal requirements of Federal Rule of Civil Procedure 26(a)(2).

In any event (i.e., even absent any inference of tactical motive), the Court finds the record bereft of any reasonable explanation for Plaintiff Indura's failure to make a proper "Disclosure of Expert Testimony" by the Scheduling Order deadline.

Importance of Expert(s)/Merits-Based Disposition Policy

Plaintiff Indura has asserted that "[t]he significance of [Jorquera Encina's] testimony (and the testimony of . . . Quintana) cannot be understated." (Docket Entry 27 at 8.) Defendant ECII has not contested this view. (See Docket Entry 20 at 13-14.) Moreover, the parties' summary judgment filings underscore the critical importance of Jorquera Encina's opinions to the legal

_____

[11] The fact that Plaintiff Indura has admitted that, as of May 9, 2011, it did not know Jorquera Encina's "rates for testimony in the case" (Docket Entry 27 at 3 n.2) and that Jorquera Encina testified in his deposition that he only definitively learned in late March 2011 that Plaintiff Indura wished him to testify for a case in the United States (see Docket Entry 29-2 at 3-4) reinforces the Court's inference in this regard.

viability of Plaintiff Indura's claims.  (See, e.g., Docket Entry 31 at 8-9, 16; Docket Entry 36 at 9-10, 13, 15.)  Striking Plaintiff Indura's expert reports and opinions (in particular, from Jorquera Encina) thus may well end this case without consideration of the merits of the Complaint; the Court should apply the Federal Rules of Civil Procedure in a manner that avoids that result, if possible.  See generally United States v. Moradi, 673 F.3d 725, 727 (4th Cir. 1982) (observing that "clear policy of the [Federal] Rules [of Civil Procedure] is to encourage dispositions of claims on their merits"); Reizakis v. Loy, 490 F.2d 1132, 1135 (4th Cir. 1974) ("Against the power to prevent delays must be weighed the sound public policy of deciding cases on their merits.").

Prejudice to Opposing Party

Defendant ECII has identified the following prejudice that would flow from a failure to strike the expert reports and opinions of Jorquera Encina and Quintana:

> [Defendant ECII] will have to obtain permission from the Court to, in essence, prepare new expert reports that consider and address any opinions that may be offered by [Plaintiff] Indura.  Doing so would require significant time and expense on the part of [Defendant] ECII, something that could have been avoided entirely had [Plaintiff] Indura followed the Rules and adhered to the deadline that it selected and the Court imposed.  It would also look past the significant fact that [Defendant] ECII was forced to prepare its expert reports without knowing the details of [Plaintiff] Indura's product defect theory.

(Docket Entry 20 at 14 (emphasis added).)

These assertions do not establish any substantial prejudice. First, the Court can address "the significant fact" that Defendant

ECII's previously-disclosed expert report(s) do not confront Jorquera Encina's opinions (or, for that matter, the opinions of Quintana), by allowing Defendant ECII to supplement its "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2). Further, the Court can do so without requiring Defendant ECII to make any further filings with the Court (and thereby allow Defendant ECII to "avoid[] entirely" any additional expenditure of time and money).[12] Moreover, the Court can direct Plaintiff Indura to pay any increased marginal cost Defendant ECII incurs because it needs to obtain the supplemental expert reports in an expedited fashion in light of the impending trial date. Finally, Defendant ECII previously has provided a translated version of Jorquera Encina's report(s) to at least one retained expert (see Docket Entry 29 at 7-8) and said expert has formed an opinion about Jorquera Encina's conclusions (see Docket Entry 29-5 at 3), circumstances that should enable Defendant ECII to obtain its supplemental expert report(s) on the product defect issue quickly.

Lesser Alternative Sanctions

As indicated by the immediately foregoing discussion of prejudice, see supra, pp. 26-27, the Court has available alternative sanctions short of striking the expert reports and opinions of Jorquera Encina and Quintana, i.e., the Court can allow

---

[12] Had Plaintiff Indura properly disclosed Jorquera Encina and Quintana as expert witnesses, Defendant ECII would have had to bear the cost of any controverting expert analysis; accordingly, the cost of obtaining such analysis (and related reporting) at this point does not represent an "additional" expense arising from Plaintiff Indura's failure to comply with the Scheduling Order.

Defendant ECII to supplement its prior "Disclosure of Expert Testimony" and can require Plaintiff Indura to pay Defendant ECII for any premium Defendant ECII might incur to secure such expert analysis and reporting on an expedited basis. In addition, the Court can order Plaintiff Indura to reimburse Defendant ECII for its costs in translating the "IDIEM" and "Quintana Lopez Donaghue and Gonzales" reports from Spanish (the language in which they were prepared for use in the Chilean litigation) into English (the language in which a litigant reasonably should expect to receive expert reports intended for use in litigation in this Court, <u>see generally</u> <u>Sunroof de Mexico, S.A. de C.V. v. Webasto Roof Sys., Inc.</u>, No. 05-40031, 2006 WL 1042072, at *3 (E.D. Mich. Apr. 19, 2006) (unpublished) (discussing prior order that directed plaintiff to pay "translator expenses" associated with its non-English-speaking expert)).[13] As a final matter, the Court may require Plaintiff Indura to pay any other reasonable expenses, including attorney's fees, Defendant ECII incurred as a result of Plaintiff Indura's non-compliance. <u>See</u> Fed. R. Civ. P. 16(f)(2).

Need for Expeditious Resolution/Docket Management

"[T]he scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel

---

[13] If Plaintiff Indura had not sought to rely on these reports as part of its "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2) and, instead, treated them simply as ordinary documents requested by an opposing party in discovery, the Court likely could not properly order Plaintiff Indura to pay the translation costs. <u>See generally</u> <u>In re Puerto Rico Elec. Power Auth.</u>, 687 F.2d 501, 506-09 (1st Cir. 1982); <u>but see</u> <u>Stapleton v. Kawasaki Heavy Indus., Ltd.</u>, 69 F.R.D. 489, 490 (N.D. Ga. 1975).

without peril." Forstmann v. Culp, 114 F.R.D. 83, 85 (M.D.N.C. 1987) (internal quotation marks omitted). To the contrary, it represents "the critical path chosen by the [Court] and the parties to fulfill the mandate of [Federal] Rule [of Civil Procedure] 1 in securing the just, speedy, and inexpensive determination of every action." Marcum v. Zimmer, 163 F.R.D. 250, 253 (S.D.W. Va. 1995) (internal brackets and quotation marks omitted). This Court thus has a strong tradition of enforcing scheduling order deadlines to ensure that trials take place as planned. See Walter Kidde Portable Equip., Inc. v. Universal Security Instruments, Inc., No. 1:03CV537, 2005 WL 6043267, at *3 (M.D.N.C. July 7, 2005) (unpublished) (noting that "court's scheduling practice has proven to be effective for the management of individual cases and for overall docket control and management" and citing "court's history of strict adherence to discovery schedules").

The Court concludes that the trial of this case likely can go forward as scheduled even if, instead of striking Plaintiff Indura's expert opinions and reports, the Court permits Defendant ECII to supplement its prior "Disclosure of Expert Testimony" (on an expedited basis at Plaintiff Indura's expense) to address Plaintiff Indura's untimely disclosure of its reliance on the expert opinions of Jorquera Encina and Quintana.[14] Moreover, to the extent Defendant ECII complains that delay in the resolution of the

---

[14] Although the October 2011 Master Calender term begins on October 3, 2011, it lasts for an extended period and a number of cases generally are set for each term. As a result, the term's trial judges likely will have some flexibility to determine when (within the term) this case should come to trial.

case may result, it stands in a somewhat compromised position because of the manner in which it reacted to Plaintiff Indura's failure to make a timely, proper "Disclosure of Expert Testimony."

First, as set out above, see supra, pp. 13-15, as a function of Plaintiff Indura's "Initial Disclosure" and responses to Defendant ECII's discovery requests, by November 22, 2010, Defendant ECII knew that Jorquera Encina and Quintana were potential witnesses and Defendant ECII possessed reports authored by said witnesses. Second, Defendant ECII has not contested Plaintiff Indura's assertions that, no later than December 14, 2010, Defendant ECII had obtained an English translation of Jorquera Encina's report(s) and the parties (through counsel) had discussed his conclusions at length. (See Docket Entry 27 at 3; Docket Entry 29 at 7.) Third, when the February 1, 2011, deadline for Plaintiff Indura to make its "Disclosure of Expert Testimony" came and went without proper notice, rather than bringing the matter to Plaintiff Indura's attention promptly, Defendant ECII chose to sit on its hands until March 4, 2011, the deadline for its own "Disclosure of Expert Testimony." (See Docket Entry 19 at 2.)

From the foregoing circumstances, the Court concludes that Defendant ECII chose to respond to Plaintiff Indura's tactical gamesmanship, see supra, pp. 23-25, with its own. Specifically:

1) from the inception of this case, Defendant ECII (with the benefit of experienced counsel from a large regional law firm) reasonably should have understood that, at least as to product

-30-

defect issues, Plaintiff Indura likely intended to rely on some expert-based evidence from the related Chilean litigation;

2) at any time after Plaintiff Indura's response to Defendant ECII's interrogatories and document requests on November 22, 2010 (through which Plaintiff Indura left apparently purposeful ambiguity about what expert-based evidence from the related Chilean litigation it would seek to utilize in this case), Defendant ECII could have requested clarification from Plaintiff Indura;

3) Defendant ECII (correctly, in the Court's view, see supra, pp. 13-20) recognized that Plaintiff Indura failed to make a proper "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2) by February 1, 2011; and

4) Defendant ECII avoided seeking clarification from Plaintiff Indura about the expert-based evidence on which it would rely (both between November 22, 2010, and February 1, 2011, and between February 1 and March 4, 2011) in the hope of obtaining a tactical advantage (i.e., an arguable basis to have Plaintiff Indura's expert opinions excluded).

### Synthesis of Factors

No reasonable excuse exists for Plaintiff Indura's failure to make a timely, proper "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2). However, the opinions of Jorquera Encina, in particular, have great significance to this case. Indeed, without such evidence, Plaintiff Indura may not receive a merits-based determination of its claims, a result that — under the public policy embodied by the Federal Rules of Civil

Procedure — the Court generally should seek to avoid.  Moreover, Defendant ECII has failed to identify any material prejudice that lesser sanctions could not ameliorate.  Finally, the Court's interest in managing its docket does not require the striking of Plaintiff Indura's expert reports and Defendant ECII has forfeited its right to complain about any delay because, rather than taking prompt steps to get this case on track, it doubled down in what has become a game of litigation cat-and-mouse.

On balance, these considerations convince the Court that striking Plaintiff Indura's expert reports and opinions would not represent a "just order[]," Fed. R. Civ. P. 16(f), to address Plaintiff Indura's failure to comply with the Scheduling Order's deadline for "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2).  Instead, the Court:

1) will permit Defendant ECII to supplement its own "Disclosure of Expert Testimony" by September 16, 2011, to account for the opinions in the reports of Jorquera Encina and Quintana;

2) will require Plaintiff Indura to pay any premium Defendant ECII must incur to obtain such expert analysis and related reporting on an expedited basis;

3) will direct Plaintiff Indura to reimburse Defendant ECII for translation of the reports of Jorquera Encina and Quintana; and

4) will order Plaintiff Indura to show cause why it and/or its attorneys should not pay any other expenses, including reasonable attorney's fees, of Defendant ECII related to Plaintiff Indura's failure to make a timely, proper "Disclosure of Expert Testimony."

Second Motion to Strike

Defendant ECII also has moved to strike the rebuttal expert report of Lorenzo and to exclude his testimony as "untimely and violat[ive of] the Court's [S]cheduling [O]rder, the Federal Rules of Civil Procedure, and the Court's Local Rules[.]" (Docket Entry 25 at 2.) More specifically, in its brief in support of its Second Motion to Strike, Defendant ECII argued, inter alia, that Plaintiff Indura violated this Court's Local Rule 26.1(c) by disclosing Lorenzo's expert report too late for Defendant ECII to depose him within the discovery period. (See Docket Entry 26 at 4-5.) In its response, Plaintiff Indura failed to address this specific argument; indeed, Plaintiff Indura's brief does not even mention this Court's Local Rule 26.1(c). (See Docket Entry 32 at 1-11.)

For reasons detailed in Kinetic Concepts, Inc. v. ConvaTec Inc., No. 1:08CV918, 2010 WL 1667285, at *6-8 & nn.12, 13 (M.D.N.C. Apr. 23, 2010) (unpublished), Plaintiff Indura's failure to respond to Defendant ECII's argument regarding Local Rule 26.1(c) constitutes a concession that generally warrants granting the requested relief under this Court's Local Rule 7.3(k). After due consideration, the Court finds no reason to depart from that general rule in this case. First, the record does reflect that Plaintiff Indura sent Lorenzo's report to Defendant ECII by e-mail after the close of business on April 29, 2011, the final day of the discovery period under the Scheduling Order. (See Docket Entry 26-1 at 1; see also Docket Entry 12 at 1.) Further, the text of the e-mail indicates Plaintiff Indura's recognition that Defendant ECII

should have the right to depose Lorenzo. (<u>See</u> <u>id.</u>) Under this Court's Local Rules, "[t]he requirement that discovery be completed within a specified time means that adequate provisions must be made for . . . depositions to be held within the discovery period." M.D.N.C. R. 26.1(c). By disclosing Lorenzo as an expert witness and tendering his report to Defendant ECII after the close of business on the final day of the discovery period, Plaintiff Indura violated the foregoing Local Rule because it clearly did not make "adequate provisions," <u>id.</u>, for Lorenzo's deposition "to be held within the discovery period," <u>id.</u>

"If an attorney or a party fails to comply with a [L]ocal [R]ule of this [C]ourt, the [C]ourt may impose sanctions against the attorney or party, or both. The [C]ourt may make such orders as are <u>just</u> under the circumstances of the case, including . . . <u>prohibiting the party from introducing designated matters in evidence</u> . . . ." M.D.N.C. R. 83.4(a) (emphasis added). "The imposition of sanctions for violation of a [L]ocal [R]ule is discretionary with the [C]ourt. In considering the imposition of sanctions, the [C]ourt may consider whether a party's failure was substantially justified or whether other circumstances make the imposition of sanctions inappropriate." M.D.N.C. R. 83.4(b).

Striking Lorenzo's report and excluding his testimony represents a "just" order (within the meaning of Local Rule 83.4(a)) to remedy Plaintiff Indura's violation of Local Rule 26.1(c). In addressing another of Defendant ECII's arguments (i.e., that, for reasons discussed in <u>Akeva</u>, 212 F.R.D. at 310, the

Scheduling Order did not permit rebuttal expert reports (see Docket Entry 26 at 6-7)),[15] Plaintiff Indura has asserted that the Court should opt against striking Lorenzo's report and excluding his testimony; instead, according to Plaintiff Indura, the Court simply should allow a deposition of Lorenzo notwithstanding the expiration of the discovery period. (See Docket Entry 32 at 9-10.) The Court finds this alternative unacceptable.

"Given their heavy case loads, district courts require the effective case management tools provided by [Federal] Rule [of Civil Procedure] 16." Nourisan Rug Corp. v. Parvizian, 535 F.3d 295, 298 (4th Cir. 2008). These tools include, perhaps most

_____

[15] Because the Court will grant the relief requested by Defendant ECII based on Plaintiff Indura's violation of Local Rule 26.1(c), no need exists to reach Defendant ECII's alternative argument premised on Akeva. The Court, however, notes that Defendant ECII's contention that "Akeva is controlling here, particularly as one judge may not overrule another judge in the same district" (Docket Entry 33 at 6 (citing Hervey v. Metlife GenIns. Corp. Sys. Agency of Miss., 154 F. Supp. 2d 909, 916 n.1 (S.D. Miss. 2001))) lacks merit. See Threadgill v. Armstrong World Indus., Inc., 928 F.2d 1366, 1371 (3d Cir. 1991) ("[T]here is no such thing as the law of the district. Even where the facts of a prior district court case are, for all practical purposes, the same as those presented to a different district court in the same district, the prior resolution of those claims does not bar reconsideration . . . of similar contentions. The doctrine of stare decisis does not compel one district court judge to follow the decision of another. Where a second judge believes that a different result may obtain, independent analysis is appropriate." (internal citation, footnote, and quotation marks omitted)); accord ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 547 F.3d 109, 112 (2d Cir. 2008); Midlock v. Apple Vacations West, Inc., 406 F.3d 453, 457-58 (7th Cir. 2005); In re Executive Office of President, 215 F.3d 20, 24 (D.C. Cir. 2000); United States v. Cerceda, 172 F.3d 806, 812 n.6 (11th Cir. 1999); Willner v. Budig, 848 F.2d 1032, 1035 (10th Cir. 1988); Starbuck v. City and Cnty. of San Francisco, 556 F.2d 450, 457 n.13 (9th Cir. 1977); Ford v. CSX Transp., Inc., 162 F.R.D. 108, 111 n.1 (E.D.N.C. 1995); Jensen v. Conrad, 570 F. Supp. 91, 106 (D.S.C. 1983). The opinion on which Defendant ECII relied to argue that a district court decision has precedential effect within that same district actually recognized the contrary view — i.e., that each district court ruling stands independently — by pointing out that a later decision by a district court does not "overrule" a prior contrary decision from within the same district. See Hervey, 154 F. Supp. 2d at 916 n.1.

significantly, the requirement that (unless exempted by Local Rule) every case have a deadline for discovery. See Fed. R. Civ. P. 16(b)(3). This deadline would become meaningless if the Court began extending the discovery deadline as a matter of course to accommodate litigants who violate Local Rule 26.1(c) by belatedly disclosing witnesses. The Court declines to undermine Federal Rule of Civil Procedure 16(b)(3) in such a fashion and instead reaffirms the principle that "[t]he disruption caused by the proliferation of untimely expert testimony is real and attorneys must know such will not be permitted." Akeva, 212 F.R.D. at 312.

Nor does the Court find any substantial justification or other circumstance that would render the striking of Lorenzo's report and exclusion of his testimony inappropriate. See M.D.N.C. R. 83.4(b). First, because Plaintiff Indura sought to rely on Lorenzo only as a rebuttal witness (rather than to support its case-in-chief), the striking of his report and the exclusion of his testimony does not pose the prospect of undermining the legal viability of Plaintiff Indura's claims. Said sanction thus does not come into conflict with any public policy favoring merits-based resolution of cases.[16] Further, although Plaintiff Indura has excuses as to why it could not produce Lorenzo's report sooner (see Docket Entry 32 at 3-4, 7-8), it has offered no reason why it failed to seek an extension of the discovery period, in order to "make adequate provisions . . .

---

[16] In these two respects, the striking of Lorenzo's report and the exclusion of his testimony therefore differs materially from the proposed imposition of such sanctions as to Jorquera Encina, see supra, pp. 25-26.

[for his] deposition[] to be held within the discovery period,"
M.D.N.C. R. 26.1(c).  (See Docket Entry 32 at 1-11.)

This failure is particularly striking given that:

1) in a letter to Defendant ECII dated March 21, 2011,
Plaintiff Indura acknowledged that it either had to disclose any
rebuttal expert "in advance of" the discovery deadline or had to
secure "Court approval" for an extension of that deadline (Docket
Entry 20-3 at 3 ("[Plaintiff] Indura may, and reserves the right
to, designate additional expert witnesses in rebuttal to [Defendant
ECII's] recently produced expert reports, and will provide any such
reports to [Defendant ECII] in advance of the current discovery end
date, unless the parties further extend that date by agreement
subject to Court approval." (emphasis added)); and

2) mere hours before Plaintiff Indura disclosed Lorenzo's
report to Defendant ECII on April 29, 2011, Plaintiff Indura filed
its Discovery-Extension Motion, but failed to make any reference to
Lorenzo or the need for an extension of the discovery period to
accommodate his late disclosure (see Docket Entry 21 at 1-2).

These facts demonstrate that Plaintiff Indura knew it could
not properly disclose Lorenzo's report after the close of business
on the final day of the discovery period without the Court's
permission, but did so anyway, while at the same time seeking an
extension of the discovery period on other grounds (which extension
Plaintiff Indura surely then would have used as a defense to any
charged violation of Local Rule 26.1(c)).  Such conscious defiance
of the Court's Local Rules and apparent attempted manipulation of

the litigation process underscores the propriety of the sanction requested by Defendant ECII, i.e., the striking of Lorenzo's report and the exclusion of his testimony. See <u>Akeva</u>, 212 F.R.D. at 311 ("Where a [litigant] operates in bad faith or with deliberation, exclusion of evidence is often appropriate."). Accordingly, the Court will grant Defendant ECII's Second Motion to Strike.

<u>Motion for Summary Judgment</u>

Defendant ECII has moved for summary judgment on each of Plaintiff Indura's claims on the following grounds:

1) Plaintiff Indura "lost the [S]ubject [V]alve . . . before [Defendant] ECII had an opportunity to test or inspect [it] to challenge or disprove [Plaintiff] Indura's defect theory" (Docket Entry 30 at 2);

2) Plaintiff Indura "failed to properly designate a liability expert in support of its defect theory . . . [such that it] cannot establish legally sufficient evidence of a defect in the [Subject] [V]alve or of negligence on the part of [Defendant] ECII" (<u>id.</u>);

3) Plaintiff Indura "failed to make a prima facie products liability case" (<u>id.</u>);

4) Plaintiff Indura "failed to adequately support its breach of warranty claims" (<u>id.</u>); and

5) "[w]ithout underlying liability, [Plaintiff] Indura's contribution and indemnity claims necessarily fail" (<u>id.</u>).

*Applicable Legal Standards*

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Instead, it "must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor." Matvia v. Bald Head Island Mgt., Inc., 259 F.3d 261, 266 (4th Cir. 2001).

"[T]here is no burden upon 'the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact.' Rather, 'the burden on the moving party may be discharged by "showing" — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case.'" Carr v. Deeds, 453 F.3d 593, 608 (4th Cir. 2006) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)) (internal emphasis omitted). Conversely, "[t]he party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)); see also Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

To the extent the Court must make conclusions about matters of state law in evaluating Defendant ECII's Motion for Summary Judgment, "the highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted." West v. American Tel. & Tel. Co., 311 U.S. 223, 236 (1940).  However, "[a] state is not without law save as its highest court has declared it.  There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them."  Id.  Accordingly, "it is the duty of [a federal court facing a question of state law] to ascertain from all the available data what the state law is and apply it . . . ."  Id. at 237.  "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  Id.

*Loss of the Subject Valve*

Defendant ECII's summary judgment motion asserts that, "[b]ecause [Plaintiff] Indura lost the [S]ubject [V]alve, [Defendant] ECII is entitled to judgment as a matter of law on all of [Plaintiff] Indura's claims."  (Docket Entry 30 at 2.) Plaintiff Indura has not disputed that the Subject Valve

disappeared during the pendency of this case, while in the custody of its expert witness, Jorquera Encina, or that it had an obligation to preserve the Subject Valve during this litigation; instead Plaintiff Indura has argued that the circumstances do not warrant dismissal. (<u>See</u> Docket Entry 36 at 4-8.)  The parties have agreed that the legal standard for "spoliation" of evidence established by the United States Court of Appeals for the Fourth Circuit in <u>Silvestri v. General Motors Corp.</u>, 271 F.3d 583 (4th Cir. 2001), governs resolution of this issue.  (<u>Compare</u> Docket Entry 31 at 4, 6-7, <u>with</u> Docket Entry 36 at 5-8.)

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." <u>Silvestri</u>, 271 F.3d at 590.  "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the judicial process.'" <u>Id.</u> (quoting <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 45-46 (1991)). "[W]hen imposing spoliation sanctions, 'the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct.'  But dismissal should be avoided if a lesser sanction will perform the necessary function."  <u>Id.</u> (quoting <u>Vodusek v. Bayliner Marine Corp.</u>, 71 F.3d 148, 156 (4th Cir. 1995)).

Indeed, because "dismissal is severe and constitutes the ultimate sanction for spoliation . . . [i]t is usually justified only in circumstances of bad faith or other 'like action.'" Id. at 593 (quoting Cole v. Keller Indus., Inc., 132 F.3d 1044, 1047 (4th Cir. 1998)).  However, "even when conduct is less culpable, dismissal may be necessary if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case." Id.  In sum:

> [T]o justify the harsh sanction of dismissal, the district court must consider both the spoliator's conduct and the prejudice caused and be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.

Id. (emphasis added).

In evaluating the "spoliator's conduct" to determine the level of "egregious[ness]," id., courts focus on the culpability of the spoliator's state of mind, e.g., negligent or willful. See, e.g., Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 529-31 (D. Md. 2010).  In this case, shortly after the fish-kill underlying this suit, experts retained by or on behalf of Defendant ECII and Plaintiff Indura witnessed the Subject Valve's removal from the oxygenation system and the dismantling of the Subject Valve down to a level that revealed its component parts.  (See Docket Entry 31-8 at 9-11; Docket Entry 36-1 at 4-5.)  Plaintiff Indura's expert, Jorquera Encina, thereafter took custody of the Subject Valve to conduct a further examination in Chile.  (See

Docket Entry 36-1 at 5-9.)  Jorquera Encina completed his report in October 2008 (see id. at 2), after which the Subject Valve was stored in a "warehouse" until March 2011, when he "took it out of the warehouse and . . . to the laboratory" (Docket Entry 31-5 at 3-4, 6, 8).  In April 2011, "[t]he offices for the laboratory were moved . . . [while Jorquera Encina] was working . . . in the United States and everything within the office was put in boxes . . . ." (Id. at 3-4.)  Jorquera Encina subsequently looked in the boxes, but could not find the Subject Valve.  (Id. at 4.)

Defendant ECII has labeled Plaintiff Indura's "failure to maintain possession of the [Subject] [V]alve . . . egregious" (Docket Entry 31 at 6), but has offered no argument or authority that would allow the Court to characterize the conduct of Plaintiff Indura's expert that resulted in the loss of the Subject Valve as anything more than negligent (see id.).  For its part, although Plaintiff Indura has emphasized that the record lacks evidence of any intentional destruction of the Subject Valve, Plaintiff Indura has not denied that the circumstances support a finding of negligence.  (See Docket Entry 36 at 5-8.)[17]  Such culpability constitutes fault warranting sanctions, but does not alone justify dismissal.  See Silvestri, 271 F.3d at 590, 593-94.

---

[17] Nor has Plaintiff Indura sought to avoid accountability for spoliation because the loss occurred while its hired consultant (rather than its employees) had custody of the Subject Valve.  (See Docket Entry 36 at 5-8.)

The Court therefore must "turn to the prejudice suffered by [Defendant ECII]," id. at 594, which articulated its view on that subject as follows:

> According to [Plaintiff] Indura, the [Subject] [V]alve did not open because of a depression in [its] seal so small that Jorquera [Encina] used a microscope to photograph it. Jorquera [Encina] tellingly did not run a single test to confirm his theory. Rather, he photographed the [Subject] [V]alve and measured [it] at room temperature and cryogenic temperatures. And now, because the [Subject] [V]alve is lost, [Defendant] ECII will never be able to reproduce Jorquera [Encina]'s measurements or perform any testing to prove that the alleged microscopic depression – even if it existed – would not impact the [Subject] [V]alve's function.

(Docket Entry 31 at 6-7 (internal citations and footnote omitted).) In light of these circumstances, Defendant ECII's summary judgment brief declares that Plaintiff Indura's "conduct has resulted in the ultimate prejudice to [Defendant] ECII, robbing it of 'the ability to defend [this suit].'" (Id. at 7 (quoting Silvestri, 271 F.3d at 593).) The record does not support that assertion.

First, prior to the institution of this litigation, one of Defendant ECII's engineering experts obtained drawings of Trusal's oxygenation system, spoke to "the facility manager, the design engineer and maintenance personnel," observed said system in operation, and witnessed the removal of the Subject Valve; in addition, said expert photographed the Subject Valve (including when disassembled) and participated in basic testing of its functionality. (See Docket Entry 31-8 at 10-11.) Two of Defendant ECII's engineering experts thereafter produced reports based, in part, on information obtained in that initial investigation. (See

Docket Entry 20-1 at 11-14, 22-30.)  The first (dated March 2, 2011) concluded that "[t]he incident at the Trusal facility was the result of a system design failure and had nothing to do with the quality or design of the [Subject] [V]alve."  (Id. at 14.)  The second (dated March 4, 2011) reported:  "Based on information available to date there is no indication that the [Subject Valve] was defective in design or manufacture.  The most likely cause of the alleged failure of the [S]ubject [V]alve to operate was the system design and operation."  (Id. at 27 (bullet points omitted).)

Further, although Defendant ECII made a request for production of the Subject Valve early in the discovery process (see Docket Entry 31-6 at 9), the record contains no evidence that Defendant ECII pursued such an inspection between November 22, 2010 (when Plaintiff Indura responded that the Subject Valve "will be made available for inspection at a mutually convenient time and place" (id.)) and sometime in or around April 2011 (when Defendant ECII decided to go forward with a deposition of Jorquera Encina in the United States and reached an agreement with Plaintiff Indura that he would bring the Subject Valve to that deposition (see Docket Entry 29 at 2-3 & n.3)).[18]

---

[18] The only documentary evidence in the record regarding any intervening communications between the parties on this topic consists of an e-mail dated March 3, 2011, from Douglas Fox (an attorney with the same law firm as Plaintiff Indura's counsel of record) to one of Defendant ECII's attorneys that contains the following statement:

> I suspect both sides will also want to examine, in a lab, the [Subject] [V]alve itself, which is currently in Chile.  With your consent, I will have it shipped to a lab in the US (probably in
> (continued...)

Because of scheduling conflicts, Jorquera Encina's deposition could not take place by the April 29, 2011, discovery deadline and, following filings by both parties (documented above, see supra, pp. 6-8), the Court granted an additional two weeks for said deposition to occur. (See Docket Entry 24.) Defendant ECII's filing did not mention any possible future need for additional time to conduct testing or to serve supplemental expert reports regarding any such testing. (See Docket Entry 22 at 1-5.) Nor, in its briefs challenging the timeliness of Plaintiff Indura's expert disclosures, did Defendant ECII assert that it might need leave of

_____

[18](...continued)
Florida) for further and future examination. Let's develop a joint protocol to examine the [Subject] [V]alve further. I will have our expert put together an initial draft of a protocol and forward it to you for your review and comments.

(Docket Entry 31-7 at 2.) Defendant ECII moved to strike Jorquera Encina's report and opinions on April 15, 2011. (See Docket Entry 19.) In briefing on that First Motion to Strike, Defendant ECII admitted that it initially had taken the position that the parties should "wait[] until the [First Motion to Strike] was decided to determine whether Jorquera [Encina]'s deposition was necessary . . . [but that it later] agreed to depose Jorquera [Encina], subject to [the First Motion to Strike]." (Docket Entry 29 at 3 n.3.) At Jorquera Encina's deposition on May 12, 2011, Defendant ECII's counsel objected to Jorquera Encina's failure to bring the Subject Valve and stated:

    [The Subject Valve] was requested in discovery in a Rule 34 request. Mr. Fox had previously represented to me that the [Subject] [V]alve would be brought to the United States, and that the parties would agree on a protocol to allow equal access to [it]. . . . [T]hat didn't happen; after the last round of the depositions Mr. Fox indicated that the [Subject] [V]alve would be brought today by [Jorquera Encina]; and, as we just learned, he did not bring [it] with him.

(Docket Entry 31-5 at 4-5.) These record facts support an inference that Defendant ECII did not ask Plaintiff Indura to have Jorquera Encina bring the Subject Valve to the United States until sometime in April 2011 and fail to show any other request by Defendant ECII for access to the Subject Valve between November 22, 2011, and April 2011.

Court to disclose reports regarding additional expert testing it planned to do on the Subject Valve. (See Docket Entry 20 at 1-15; Docket Entry 26 at 1-7.)[19]

Jorquera Encina's deposition convened on May 12, 2011, at which time he revealed that he could not find the Subject Valve. (See Docket Entry 31-5 at 2-4.) Defendant ECII then began raising arguments indicating that its inability to conduct tests on the Subject Valve prejudiced its defense, first in its reply as to its First Motion to Strike (see Docket Entry 29 at 2-4), then in its summary judgment brief (see Docket Entry 31 at 7), and even in its reply as to its Second Motion to Strike (Docket Entry 33 at 9).

The foregoing circumstances demonstrate that Plaintiff Indura's loss of the Subject Valve is not "so prejudicial that it substantially denied [Defendant ECII] the ability to defend the [case]," Silvestri, 271 F.3d at 593. First, Defendant ECII has the ability to defend this suit based on its engineering experts' theory that flaws in the design of the oxygenation system, not any defect in the Subject Valve, caused the fish-kill. Second, Defendant ECII's conduct prior to the revelation of the Subject Valve's disappearance indicates that Defendant ECII did not

_____

[19] Notably, in the latter filing, Defendant ECII took the position that the Scheduling Order in this case did not permit rebuttal expert reports (see Docket Entry 26 at 6-7); under that theory, it would appear Defendant ECII only could have relied at trial on any further expert testing of the Subject Valve if it disclosed the results thereof as part of a proper supplement to its original "Disclosure of Expert Testimony" under Federal Rule of Civil Procedure 26(a)(2) or otherwise received permission from the Court.

consider further testing of the Subject Valve an important priority in its defense of this case.

As previously discussed (see supra, pp. 30-31):

1) from the inception of this litigation, Defendant ECII reasonably should have known that Plaintiff Indura might rely on expert witness opinions it had obtained in connection with the prior Chilean litigation; and

2) by December 2010, Defendant ECII possessed a translated version of Jorquera Encina's report, which its counsel had discussed at length with Plaintiff Indura's counsel.

Defendant ECII, however, took no documented steps to follow-up on Plaintiff Indura's commitment to make the Subject Valve "available for inspection at a mutually convenient time and place" (Docket Entry 31-6 at 9), until the final month of the discovery period. Moreover, even when the discovery deadline arrived, when the parties made filings with the Court about whether (and for what purposes) they should have the right to conduct further discovery, and when Defendant ECII moved to exclude Plaintiff Indura's expert evidence for lack of timely, proper disclosure, Defendant ECII never informed the Court of any need it had for further testing of the Subject Valve or for belated reporting of related expert findings. Instead, Defendant ECII only mentioned its interest in such additional expert analysis after it learned that Plaintiff Indura lost the Subject Valve.

According to Defendant ECII, despite the fact that it made a plan that provided for the production of the Subject Valve only

after the close of discovery and that it never signaled any prior intention to conduct further testing:

> [H]ad the [Subject] [V]alve been produced [Defendant] ECII would have examined [it] and, if necessary, petitioned the Court for additional testing, would have used the [Subject] [V]alve to prepare its cross-examinations at trial, and would have subpoenaed the [Subject] [V]alve for trial and used it to demonstrate in front of the jury that [Plaintiff] Indura's defect theory is baseless.

(Docket Entry 37 at 4.) However, given that Defendant ECII has neither explained how (and on what authority) it would have secured Court approval for any such testing (see id.) nor identified what type of tests it might have performed and how it my have used the Subject Valve at trial to debunk Plaintiff Indura's theory (see id.), Defendant ECII's assertions in this regard carry little weight in the prejudice assessment.

Defendant ECII's failure to ensure that its expert took proper care of the Subject Valve deserves condemnation by the Court. Even at the late hour at which it got around to arranging for the production of the Subject Valve, Defendant ECII should have had an opportunity for its expert to examine the Subject Valve without additional Court authorization (although, absent further order from the Court, said expert likely could not have tested the Subject Valve in any manner to which Plaintiff Indura declined to consent). Perhaps (based on that examination) said expert then could have helped Defendant ECII craft a stronger cross-examination of

Jorquera Encina[20] (although said expert likely could not have testified about any such examination unless Defendant ECII obtained the Court's permission to make a late expert disclosure, see generally Fed. R. Civ. P. 37(c)(1)). The loss of that opportunity constitutes prejudice, but not of such a magnitude as to have "substantially denied [Defendant ECII] the ability to defend the [case]," Silvestri, 271 F.3d at 593, particularly given Defendant ECII's independent, faulty-system-design causation theory.

The Court therefore should decline to enter judgment in Defendant ECII's favor based on Plaintiff Indura's loss of the Subject Valve and, instead, should allow the United States District Judge assigned to the trial of this case to determine whether to give an adverse inference instruction or to allow Defendant ECII to solicit testimony from witnesses and to make arguments to the jury about the matter. Such options represent less drastic, alternative responses, sufficient "'both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct,'" id. at 590 (quoting Vodusek, 71 F.3d at 156).

*Failure to Properly Designate Product Defect Expert*

Defendant ECII has argued that, "[u]nder North Carolina product liability law, expert testimony is required to provide competent evidence of a defect." (Docket Entry 31 at 8 (citing Howerton v. Arai Helmet, Ltd., 358 N.C. 440, 446-53, 597 S.E.2d

_____

[20] As previously noted, see supra, p. 27, even without access to the Subject Valve, one of Defendant ECII's experts has formulated opinions about Jorquera Encina's analysis and thus Defendant ECII already has access to some fodder for cross-examination.

674, 679-83 (2004)).)[21]  Next, Defendant ECII has asserted (correctly, in the view of the undersigned Magistrate Judge, see supra, pp. 10-20) that Plaintiff Indura "did not designate any experts by the Court's deadline." (Docket Entry 31 at 8.) As a result of that failure, Defendant ECII has maintained that Plaintiff Indura's "purported 'experts' should be excluded." (Id.) For reasons set forth above (see supra, pp. 20-32), the facts of this case do not warrant imposition of that sanction as to Jorquera Encina (a materials scientist who has rendered an opinion regarding the alleged defectiveness of the Subject Valve, see supra, p. 5 n.4). The Court therefore should reject Defendant ECII's position that Plaintiff Indura is "without experts, [such that it] cannot establish that the oxygenation system failed because of a product defect or that [Defendant] ECII breached any standard of care in the manufacturing industry" (Docket Entry 31 at 9).

*Adequacy of Proof of Negligence-Based Product Liability*

The parties have agreed that North Carolina law governs Plaintiff Indura's negligence-based product liability claim and that Red Hill Hosiery Mill, Inc. v. Magnetek, Inc., 138 N.C. App. 70, 75, 530 S.E.2d 321, 326 (2000), sets forth the proper elements of such a claim. (Docket Entry 31 at 7; Docket Entry 36 at 8.) Under said decision, "[a] products liability claim grounded in negligence requires the plaintiff prove (1) the product was defective at the time it left the control of the defendant, (2) the

---

[21] Plaintiff Indura has agreed that North Carolina law governs the negligence-based product liability claim in this case. (Docket Entry 36 at 8.)

defect was the result of defendant's negligence, and (3) the defect proximately caused plaintiff damage." Red Hill Hosiery, 138 N.C. App. at 75, 530 S.E.2d at 326; see also N.C. Gen. Stat. § 99B-1.[22]

In Defendant ECII's view, "even if [Jorquera Encina] is accepted by the Court, [Plaintiff] Indura still cannot survive summary judgment [on its negligence-based product liability claim because he] . . . admittedly did no testing to support his defect theory; he simply measured the valve and took pictures of it. That sort of cursory analysis is insufficient to support a product liability case." (Docket Entry 31 at 11 (emphasis added).)[23] Defendant ECII's argument in this regard ignores these aspects of Jorquera Encina's report:

1) Jorquera Encina observed two attempted operations of Trusal's oxygenation system, during the first of which he noted that the Subject Valve did not function at the proper pressure level and during the second of which he noted that the Subject

_____

[22] "[I]n enacting the Products Liability Act [i.e., Section 99B-1], [North Carolina's] Legislature reaffirmed the reasoning of the pre-statute cases holding that the essential elements of an action for products liability are based upon negligence . . . ." Driver v. Burlington Aviaton, Inc., 110 N.C. App. 519, 527, 430 S.E.2d 476, 482 (1993). The North Carolina Court of Appeals specifically took note of Section 99B-1 in setting out the above-quoted elements of a negligence-based product liability claim, see Red Hill Hosiery, 138 N.C. App. at 74-75, 530 S.E.2d at 325-26. Accordingly, although Defendant ECII separately has argued that Plaintiff Indura's negligence-based product liability claim fails under Red Hill Hosiery and Section 99B-1 (compare Docket Entry 31 at 10-12, with id. at 12-14), this Memorandum Opinion will not conduct such separate analyses.

[23] Defendant ECII's brief in support of its Motion for Summary Judgment does not cite Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), or otherwise explicitly contend that the Court should exclude Jorquera Encina's opinions under Federal Rule of Evidence 702. (See Docket Entry 31 at 1-19.)

Valve "start[ed] at the pressure differential established by the manufacturer" (Docket Entry 36-1 at 4);

2) upon witnessing the removal of the Subject Valve from Trusal's oxygenation system and its dismantling down to a level that revealed its interior parts, Jorquera Encina "found, at first glance, that there were neither foreign elements nor corrosion or oxidation, or excessive wear" (id. at 5);

3) Jorquera Encina thereafter took various measurements of the Subject Valve's component parts at room and low temperatures (consistent with the environment within which the Subject Valve had functioned) (id. at 5-8);

4) after noticing some measurement variations as to a "plastic seal" component of the Subject Valve, Jorquera Encina "proceeded to microscopic analysis of . . . the plastic seal" (id. at 8);

5) in so doing, Jorquera Encina "noted the presence of two defects in the seal," the first of which was "in the plane of the seal" and "about 2 mm" and the second of which was "located in the thickness of the seal," "appear[ed] to be a nail mark," and was "about 6 mm," as well as areas of "white color . . . which is characteristic of degradation of a plastic material by mechanical work" (id. at 8-9);

6) Jorquera Encina further determined that "[the second] defect ha[d] no sharp edges and the edges [we]re convex . . . [which] feature rule[d] out the possibility that deformation occurred during operation as a result of an impact against the metallic seat" and that "[t]he shape of [said defect] impl[ied]

that it ha[d] been shaped by molding[,] [p]robably, during the molding of the part" (id. at 9);

7) from these observations, Jorquera Encina "deduce[d]" (A) that, within the Subject Valve, "[w]hen the stem and the seals fall onto the metallic seat, probably depending on the speed and/or temperature, the [second defect] causes the seal to fit perfectly or with slight unevenness at closing . . . [which] helps to explain why the seal sometimes fails and sometimes works well," (B) that, over time, the unevenness "cause[d]" the first defect and the degradation of the plastic, and (C) that "the unevenness can generate a stem position of the axis of displacement . . . [such that] the minimum opening pressure varies randomly" (id.); and

8) based on the foregoing observations and deductions, Jorquera Encina "concluded that . . . [the Subject Valve] fail[ed] in its operation by a manufacturing defect in the plastic seal . . . [that] cause[d] the fall of the stem to loss [sic] its axis and to lock" (id. at 10).

The foregoing circumstances do not support Defendant ECII's contention that Jorquera Encina "simply measured the [Subject] [V]alve and took pictures of it" (Docket Entry 31 at 11) or that he engaged in only a "cursory analysis" (id.).[24] Defendant ECII has offered no other argument to suggest that, taken in the light most

---

[24] Notably, in the two cases cited by Defendant ECII in support of this aspect of its summary judgment argument (see Docket Entry 31 at 11-12), the experts on whom the plaintiff sought to rely had not even examined the allegedly defective product. See Ward v. American Med. Sys., Inc., 170 F. Supp. 2d 594, 599 (W.D.N.C. 2001), aff'd, 38 Fed. Appx. 909 (4th Cir. 2002); Hanrahan v. Walgreen Co., Inc., 243 N.C. 268, 269, 90 S.E.2d 392, 393 (1955).

favorable to Plaintiff Indura, Jorquera Encina's above-summarized, expert analysis (about which he testified in a deposition (see Docket Entry 31-5 at 8-13)) fails to represent evidence from which a reasonable fact-finder could determine that the Subject Valve had an actual defect at the time of its manufacture and that said defect proximately caused the damage of which Plaintiff Indura has complained (the first and third elements of a negligence-based product liability claim under North Carolina law, see Red Hill Hosiery, 138 N.C. App. at 75, 530 S.E.2d at 326). (See id. at 11-12.) Moreover, Plaintiff Indura can satisfy the remaining (i.e., second) element of this product liability claim, because, under North Carolina law, "[a]n inference of a manufacturer's negligence arises upon proof of an actual defect in the product." Red Hill Hosiery, 138 N.C. App. at 75, 530 S.E.2d at 326. In light of these considerations, Defendant ECII has not shown an entitlement to judgment as a matter of law on Plaintiff Indura's negligence-based product liability claim.[25]

---

[25] Whether a reasonable fact-finder ultimately would credit Jorquera Encina's analysis as to the existence of a manufacturing defect and proximate cause and/or would draw an inference that negligence caused any such manufacturing defect or, instead, would agree with Defendant ECII's experts that "there are many reasons the [Subject] [V]alve could have remained closed when [Plaintiff] Indura wanted it to open (improper system design, product misuse, product abuse, contaminants)" (Docket Entry 31 at 11) remains unknown. However, as Plaintiff Indura has observed, such matters "are for the jury to weigh and decide, and are not appropriate for decision on a motion for summary judgment" (Docket Entry 36 at 9). See generally Mosser v. Fruehauf Corp., 940 F.2d 77, 83 (4th Cir. 1991) (quoting with approval district court's statement that "'it was for the jury to weigh the evidence and the credibility of each expert'").

*Adequacy of Proof as to Breach of Warranty*

Plaintiff Indura has brought three different causes of action against Defendant ECII for breach of warranty:  1) breach of express warranty of merchantability; 2) breach of implied warranty of merchantability; and 3) breach of implied warranty of fitness for a particular purpose.  (See Docket Entry 1, ¶¶ 27-42.) Defendant ECII has moved for summary judgment on all three of these claims.  (See Docket Entry 30 at 2.)  Plaintiff Indura has responded in opposition in a manner that requires resolution of a choice of law issue before any substantive analysis can proceed. (See Docket Entry 36 at 13-17 & n.17.)

Choice of Law

As previously noted (see supra, p. 4 n.3), Plaintiff Indura's Complaint does not identify any statutory or other legal bases for its breach of warranty causes of action.  In the portion of its summary judgment brief addressing these claims, Defendant ECII cited to North Carolina law.  (See Docket Entry 31 at 14-19.) Plaintiff Indura's response generally appears to agree with that choice of law, in that it identifies Red Hill Hosiery, 138 N.C. App. at 75, 530 S.E.2d at 326, as establishing the elements applicable to its breach of warranty claims (see Docket Entry 36 at 13) and relies on opinions from the North Carolina Supreme Court and this Court (all of which address North Carolina law) in opposing summary judgment (see id. at 14-17 (citing Dewitt v. Eveready Battery Co., Inc., 355 N.C. 672, 565 S.E.2d 140 (2002), Bernick v. Jurden, 306 N.C. 435, 293 S.E.2d 405 (1982), and Carlton

<u>v. Goodyear Tire & Rubber Co.</u>, 413 F. Supp. 2d 583 (M.D.N.C. 2005)

(Bullock, J., adopting recommendation of Eliason, M.J.))).

However, in a footnote within the section of Plaintiff Indura's brief that addresses its breach of warranty claims, the following argument appears:

> [Defendant] ECII assumes incorrectly that North Carolina law applies to its <u>warranty disclaimer arguments</u>. This was a transaction completely consummated in Chile between Chilean parties. The North Carolina Supreme Court has held that <u>warranty claims</u> will be governed by North Carolina law where there is a transaction "bearing an appropriate relation to this State." <u>Boudreau v. Baughman</u>, [322 N.C. 331, 336,] 368 S.E.2d 849, 854 ([]1988). This analysis requires weighing of "significant contacts" including the place of sale, distribution, delivery, use of the product, and the place of injury. <u>Id.</u>[, 322 N.C. at 337-39, 368 S.E.2d] at 855-56. In <u>Boudreau</u>, after weighing the various factors, the court ultimately applied Florida law. <u>Id.</u> Here, <u>all of these factors favor application of Chilean law to the analysis</u>. [Defendant] ECII has not brought any Chilean law to this Court's attention in support of its motion. In general, however, Chilean law disfavors contractual limitations of liability that limit damages for the failure of a product to perform its "essential purpose." Vaughn, <u>Chilean Consumer Protection Standards and the United Nations Guidelines on Consumer Protection: A Comparative Study Revealing Regional Conflicts</u>, 22 N.C.J. Int'l L. & Com. Reg. 1, 13-14 (Fall 19[9]6).

(Docket Entry 36 at 16 n.13 (emphasis added).)[26]

This passage expressly only asserts that Chilean law (rather than North Carolina law) "applies to [Defendant ECII's] warranty disclaimer argument," <u>id.</u>, but it does so by contending that pertinent choice of law principles regarding "warranty claims" (which, it correctly notes, the Court must draw from North Carolina

---

[26] Plaintiff Indura's brief bears a scrivener's error as to the year of publication of the cited law journal article.

law, see Brendle v. General Tire & Rubber Co., 408 F.2d 116, 116 (4th Cir. 1969)) "favor application of Chilean law to the analysis" (Docket Entry 36 at 16 n.13). Plaintiff Indura has not explained how Chilean law could govern one aspect of its warranty claims (i.e., disclaimer issues), but not the elements of such claims in general. (See id.) Regardless, the Court cannot apply Chilean law unless "the requirements of Rule 44.1 of the Federal Rules of Civil Procedure are met." Baker v. Booz Allen Hamilton, Inc., 358 Fed. Appx. 476, 481 (4th Cir. 2009) (citing Ferrostaal, Inc. v. M/V Sea Phoenix, 447 F.3d 212, 216 (3d Cir. 2006), for proposition that, "where a party fails to carry its burden of proving foreign law under Rule 44.1, the forum law should apply," as well as The Hoxie, 297 F. 189, 190 (4th Cir. 1924), for its holding in a "pre-Rule 44.1 case, that forum law applies unless the party seeking to use foreign law establishes that foreign law differs from forum law").

Said Rule provides as follows:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1. This Rule thus grants federal courts "broad authority to conduct their own independent research to determine foreign law but imposes no duty upon them to do so." Baker, 358 Fed. Appx. at 481 (citing Carey v. Bahama Cruise Lines, 864 F.2d 201, 205 (1st Cir. 1988)); accord Riffe v. Magushi, 859 F. Supp.

220, 223 (S.D.W. Va. 1994). As a result, "the party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action and the burden of proving foreign law to enable the district court to apply it in a particular case." Id. "Where a party fails to satisfy either burden, the district court should apply the forum state's law." Id. (citing Ferrostaal, 447 F.3d at 216).

In this case, it does not appear that Plaintiff Indura satisfied its first obligation under Federal Rule of Civil Procedure 44.1, i.e., to "give notice by a pleading or other writing." The Advisory Committee Notes to said Rule make clear that, although a litigant need not include such notice within a pleading under Federal Rule of Civil Procedure 7(a), the timing of the notice must be "reasonable." Fed. R. Civ. P. 44.1 advisory committee's note, 1966 Adoption. "The stage which the case had reached at the time of the notice, the reason proffered by the party for his failure to give earlier notice, and the importance to the case as a whole of the issue of foreign law sought to be raised, are among the factors which the court should consider in deciding a question of the reasonableness of a notice." Id.[27]

---

[27] At least one court has held that, "[a]bsent extenuating circumstances, notice of issues of foreign law that reasonably would be expected to be part of the proceedings should be provided in the pretrial conference and contentions about applicability of foreign law should be incorporated in the pretrial order." DP Aviation v. Smiths Indus. Aerospace & Defense Sys. Ltd., 268 F.3d 829, 848 (9th Cir. 2001) (observing that "[i]nterests of judicial economy favor early notice so that the parties may plan and present argument on any issues pertinent to an application of foreign law"); but see Canadian Imperial Bank of Commerce v. Saxony Carpet Co., Inc., 899 F. Supp. 1248, 1253 (S.D.N.Y. 1995) (ruling that
(continued...)

Here, although from the inception of the case (as confirmed by its Complaint (see Docket Entry 1, ¶¶ 1-6, 9-11)) Plaintiff Indura knew all the facts it now asserts require application of Chilean law (i.e., that "[t]his was a transaction completely consummated in Chile between Chilean parties . . . [and that Chile was] the place of sale, distribution, delivery, use of the product, and the place of injury" (Docket Entry 36 at 16 n.13)), Plaintiff Indura waited until summary judgment briefing to invoke Chilean law. Further, in its belated invocation of Chilean law, Plaintiff Indura did not explain why (despite the benefit of representation by a large, international law firm) it failed either to anticipate this issue arising or to give earlier notice. Nor can the undersigned Magistrate Judge conceive of any acceptable explanation. Accordingly, even if the particular issue as to which Plaintiff Indura seeks application of Chilean law bears great significance to the case, on balance, Plaintiff Indura's notice would not qualify as reasonable in light of the factors identified in the Advisory Committee Notes to Federal Rule of Civil Procedure 44.1.

Ultimately, however, the reasonableness (or lack thereof) in the timing of Plaintiff Indura's notice of its intent to rely on Chilean law becomes a moot point because Plaintiff Indura clearly has not satisfied its second obligation under Federal Rule of Civil Procedure 44.1, i.e., "the burden of proving foreign law to enable

---

[27](...continued)
plaintiff gave adequate notice under Federal Rule of Civil Procedure 44.1 by raising foreign law issues in summary judgment filings), aff'd, No. 95-9139, 104 F.3d 352 (table), 1996 WL 629749 (2d Cir. Oct. 31, 1996) (unpublished).

the district court to apply it in a particular case," Baker, 358 Fed. Appx. at 481. Specifically, as reflected by the quotation from its summary judgment brief set out above, see supra, p. 57, Plaintiff Indura provided but one citation regarding the substance of Chilean law — a law journal article from the United States from 1996. This showing does not suffice for at least two reasons. First, said article does not set out the translated text of the applicable Chilean statutes or case law. See Vaughn, supra. Second, assuming that said article accurately summarized Chilean law regarding breach of warranty issues as of 1996 and that the Court would rely on such a mere summary, Plaintiff Indura has offered no basis for this Court to conclude that all potentially relevant Chilean law remained static between 1996 and the date of the pertinent events in this case more than a decade later.[28]

As shown by one of the above-referenced decisions cited with approval by the Fourth Circuit in Baker (see supra, pp. 58-59), defects of this sort render a litigant's showing as to foreign law inadequate under Federal Rule of Civil Procedure 44.1. See Ferrostaal, 447 F.3d at 218 (observing that plaintiff who sought to rely on Tunisian law "did not provide expert testimony, the text of the actual enactment, Tunisian court decisions, excerpts from treatises, or any other authoritative sources" and that court could not tell "whether [Tunisia] ha[d] amended its laws since 1980 [when plaintiff's filings showed Tunisia had adopted some version of

---

[28] Indeed, the article in question actually focuses on then-active proposals to revise Chilean commercial law. See Vaughn, supra.

particular international protocol]," in declining to apply Tunisian law because plaintiff "had the burden of establishing Tunisian law and showing that it differ[ed] from United States law . . . [but] did not carry that burden"); accord Fed. R. Civ. P. 44.1 advisory committee's note, 1966 Adoption (declaring that, when litigant invokes foreign law, court may "insist on a complete presentation by counsel" and that Rule "refrains from imposing an obligation on the court to take 'judicial notice' of foreign law because this would put an extreme burden on the court in many cases").

Because Plaintiff Indura "fail[ed] to satisfy [its] burden [of proving what, if anything, foreign law says about breach of warranty claims such that the Court could apply said law in this case], the [Court] should apply the forum state's law," Baker, 358 Fed. Appx. at 481.

Application of North Carolina Law

Under North Carolina law (as acknowledged by Plaintiff Indura (see Docket Entry 36 at 13)), "[a] products liability claim grounded in warranty requires the plaintiff prove (1) the defendant warranted the product (express or implied) to plaintiff, (2) there was a breach of that warranty in that the product was defective at the time it left the control of the defendant, and (3) the defect proximately caused plaintiff damage." Red Hill Hosiery, 138 N.C. App. at 75, 530 S.E.2d at 326.[29] According to Defendant ECII,

---

[29] "Thus, a products liability claim based on breach of warranty is not dependent upon a showing of negligence." Red Hill Hosiery, 138 N.C. App. at 75, 530 S.E.2d at 326. Other decisions from the North Carolina Court of Appeals, (continued...)

Plaintiff Indura cannot make out the breach element of its express and implied warranty of merchantability claims, because Plaintiff Indura lacks adequate proof that the Subject Valve had a defect when it left Defendant ECII's control and/or that any such defect caused the fish-kill. (See Docket Entry 31 at 14-18.) However, for reasons previously discussed, see supra, pp. 51-55, Defendant ECII has not shown that the record (including Jorquera Encina's report) contains insufficient evidence (taken in the light most favorable to Plaintiff Indura) to support a finding that such a defect existed and caused the oxygenation system's failure.

As an alternative ground for entry of summary judgment against Plaintiff Indura on all its breach of warranty claims, Defendant ECII has contended that the "Limited Warranty and Limitation of Liability" within its product catalog (Docket Entry 31-11 at 41): 1) properly limits the scope of the express warranty applicable to the Subject Valve to its purchase price (and thus excludes liability for the fish-kill) (see Docket Entry 31 at 14); and 2) appropriately disclaims any implied warranty of merchantability (id. at 15) and of fitness for a particular purpose (id. at 18).

---

[29](...continued)
however, have included an additional element in the express warranty context, i.e., that said warranty "'was relied upon by the plaintiff in making his decision to purchase,'" Harbor Point Homeowners' Ass'n, Inc. ex rel. Bd. of Directors v. DJF Enters., Inc., ___ N.C. App. ___, ___, 697 S.E.2d 439, 447 (2010) (quoting Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 104, 322 S.E.2d 7, 10 (1984) (citing Pake v. Byrd, 55 N.C. App. 551, 286 S.E.2d 588 (1982))). This Court (per the late United States District Judge William L. Osteen, Sr.) has adopted that construction of North Carolina law. See McDonald Bros., Inc. v. Tinder Wholesale, LLC, 395 F. Supp. 2d 255, 267 (M.D.N.C. 2005) ("To establish a claim for breach of an express warranty, a claimant must prove that an express warranty existed upon which it relied in making purchases and that the seller breached said warranty." (emphasis added) (citing Hall)).

Plaintiff Indura has responded that, "as established by the North Carolina Supreme Court, 'the existence and scope of any warranty is a question for the finder of fact.'"  (Docket Entry 36 at 17 (quoting Bernick v. Jurden, 306 N.C. 435, 450, 293 S.E.2d 405, 415 (1982)).)  Although Plaintiff Indura accurately has quoted words used in Bernick, it has wrenched them from their context in a manner that extends them further than they actually reach.

In said case, the plaintiff had alleged that, while playing in a college club hockey match (and wearing a mouthguard manufactured and/or sold by the defendant), "he was struck in the face . . . by a hockey stick,. . . . that the defendants had expressly warranted to the plaintiff that the mouthguard would give 'maximum protection to the lips and teeth[,'] that defendants breached this express warranty[,] and that the mouthguard crumbled and disintegrated and failed in its function, causing plaintiff's injuries [which included a fractured jaw and four lost or damaged teeth]." Bernick, 306 N.C. at 437, 293 S.E.2d at 407.  The plaintiff further had asserted that "these defendants had breached an implied warranty that the mouthguard was reasonably fit and safe for use in hockey games[,] that [he] relied on this implied warranty in purchasing the mouthpiece[,] and that its breach caused or contributed to his injuries." Id., 306 N.C. at 437, 293 S.E.2d at 407-08.  In seeking summary judgment, the defendants contended that the plaintiff's injury "was not foreseeable and that any warranties made, including a warranty of 'maximum protection' d[id] not insure

against injury from a criminal assault with a hockey stick." <u>Id.,</u> 306 N.C. at 450, 293 S.E.2d at 414-15.

The North Carolina Supreme Court rejected that argument for two reasons: "First, it ha[d] not been established that the blow amounted to a criminal assault. Furthermore, as argued by the plaintiff, the existence and scope of any warranty is a question for the finder of fact as is the nature and forseeability of the blow from the hockey stick." <u>Id.</u>, 306 N.C. at 450, 293 S.E.2d at 415. The <u>Bernick</u> Court thus did not rule that, <u>in each and every case decided under North Carolina law</u>, "the existence and scope of any warranty is a question for the finder of fact," <u>id.</u>, but rather only that, <u>under circumstances of the sort presented in that case</u>, "the existence and scope of any warranty is a question for the finder of fact," <u>id.</u> In other words, the <u>Bernick</u> Court recognized that a fact-finder reasonably could determine that a manufacturer and/or seller of a mouthguard promising "maximum protection to the lips and teeth" had given an express and/or an implied warranty that the mouthguard would protect wearers from suffering a broken jaw and/or four lost or damaged teeth from a blow to the face from a hockey stick (particularly where the blow, under a permissible view of the evidence, may have fallen short of a criminal assault).

In this case, a fact-finder could not reasonably construe the words of Defendant ECII's "Limited Warranty and Limitation of Liability" to provide an express warranty of sufficient scope to encompass damages of the sort Plaintiff Indura seeks in this case

or to fail to disclaim any implied warranty of merchantability, given the unambiguous declaration therein that:

1) although Defendant ECII "warrants [its] products . . . to be free from defects in materials and workmanship under normal use and service for a period of 12 months from the date of installation or operation or 18 months from the date of shipment from the factory [whichever ends first], . . . [its] total liability for any and all losses and damages arising out of any cause whatsoever shall in no event exceed the purchase price of the products or parts in respect of which such cause arises, whether such causes be based on theories of contract, negligence, strict liability, tort, or otherwise" (Docket Entry 31-11 at 41);

2) Defendant ECII "shall not be liable for incidental, consequential or punitive damages or other losses" (id.); and

3) "[e]xcept as expressly set forth above, and subject to the [foregoing] limitation of liability . . ., [Defendant ECII] makes NO OTHER WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, with respect to its products and parts . . . [and] disclaims all warranties not stated herein" (id. (capitalization in original)).

Put another way:

1) the definitive, restrictive language in Defendant ECII's "Limited Warranty and Limitation of Liability" differs too substantially from the broad warranty of "maximum protection to the

lips and teeth" at issue in <u>Bernick</u> to permit Plaintiff Indura to utilize said decision to ward off summary judgment; and

2) Plaintiff Indura has failed to identify any material factual dispute that would allow it to avoid judgment as a matter of law on an express warranty of merchantability claim seeking damages beyond the purchase price of the Subject Valve and/or on any implied warranty claim, <u>if</u> Defendant ECII's "Limited Warranty and Limitation of Liability" provides the only basis for an express warranty in this case and applies to Plaintiff Indura.

To escape the latter circumstance, Plaintiff Indura's summary judgment brief offers the following arguments:

1) Defendant ECII's "Limited Warranty and Limitation of Liability" did not satisfy North Carolina General Statute § 25-2-316(2), which "requires that such limitations be conspicuous" (Docket Entry 36 at 16 n.13);

2) the record lacks evidence that Plaintiff Indura "ever reviewed the limitation language or even considered the catalog to be part of the transaction documents" (<u>id.</u>); and

3) "the evidence of record [reflects] that when [Plaintiff] Indura selected the [Subject] [V]alve for purchase from [Defendant] ECII's authorized Chilean distributor, Imfluid, the distributor specifically recommended and approved this particular [type of] valve for this particular application [i.e., use in Trusal's oxygenation system] . . . [thereby creating] a jury question [as to] whether [Defendant] ECII, through the acts of its authorized

agent and distributor, is liable for breach of express warranty and/or warranty of fitness for a particular purpose" (id. at 17).

As to the first of these matters (i.e., whether Defendant ECII's "Limited Warranty and Limitation of Liability" satisfied North Carolina's conspicuousness test for warranty disclaimers), both parties cite Lee v. R & K Marine, Inc., 165 N.C. App. 525, 598 S.E.2d 683 (2004). (Docket Entry 31 at 15, 18; Docket Entry 36 at 16 n.13.) A review of said decision and the disclaimer in this case supports Defendant ECII's position that its "Limited Warranty and Limitation of Liability" suffices under North Carolina law. Like the disclaimer found sufficiently conspicuous in Lee, the key language in Defendant ECII's "Limited Warranty and Limitation of Liability" disclaiming any express or implied warranty (including specifically any implied warranty of merchantability or of fitness for a particular purpose) appears in all capital letters whereas the surrounding text follows normal capitalization conventions. (See Docket Entry 31-11 at 41.) In addition, the phrase "Limited Warranty and Limitation of Liability" is emblazoned at the top of the page in large, white-on-black banner lettering. (See id.) Finally, the body of the "Limited Warranty and Limitation of Liability" contains the words "Limited Warranty" and "Limitation of Liability" in all capitals above the sections of text that detail what Defendant ECII does and does not warrant. (See id.)

Plaintiff Indura has taken the position that Defendant ECII's "Limited Warranty and Limitation of Liability" nonetheless fails to qualify as conspicuous because it appeared in a catalog, rather

than on the reverse-side of a purchase agreement (or invoice) and because it used only English. (See Docket Entry 36 at 16 n.13.) "The fact that a manufacturer's disclaimer is located in a catalog, however, does not make that disclaimer per se inconspicuous." LWT, Inc. v. Childers, 19 F.3d 539, 543 (10th Cir. 1994) (citing state court decisions from Nebraska and New York, as well federal district court decision applying Pennsylvania law); see also A. Belanger & Sons, Inc. v. United States for Use & Benefit of Nat'l Radiator Corp., 275 F.2d 372, 375 (1st Cir. 1960 (recognizing existence of "line of cases [that] allow[s] a notice of disclaimer in a catalog to be effective as to a subsequent sale in certain circumstances") (citing, inter alia, Ross v. Northrup, King & Co., 156 Wis. 327, 144 N.W. 1124 (1914)). Nor has Plaintiff Indura cited any authority that North Carolina law (or the law of any jurisdiction within the United States) mandates use of languages other than (or in addition to) English in disclaimers. (See Docket Entry 36 at 16 n.13.) Under these circumstances, Defendant ECII's "Limited Warranty and Limitation of Liability" meets North Carolina General Statute § 25-2-316(2)'s conspicuousness standard.

Neither party has supplied the Court with any authority addressing the next of Plaintiff Indura's above-referenced contentions, i.e., that Defendant ECII's "Limited Warranty and Limitation of Liability" has no effect on Plaintiff Indura's breach of warranty claims because of the alleged absence of evidence that Plaintiff Indura "ever reviewed the limitation language or even considered the catalog to be part of the transaction documents"

(Docket Entry 36 at 16 n.13). (Compare id., with Docket Entry 31 at 14-19, and Docket Entry 37 at 8-9). The undersigned Magistrate Judge's own research has revealed one, fairly analogous federal decision; specifically, by drawing upon a variety of state court rulings from across the country (including Nebraska, New York, Virginia, and Wyoming), as well as the general implications of one federal circuit opinion addressing Alabama law, the United States Court of Appeals for the Tenth Circuit held as follows:

> A limited warranty contained in a manufacturer's catalog may be considered part of the basis of the parties' bargain, so long as the purchaser received the catalog and had an opportunity to read the warranty, prior to or at the time of the sale. [The] [d]efendant need not establish that [the] plaintiff had actual knowledge of the limited warranty. The question of whether the catalog containing the limited warranty became a part of the parties' bargain is ordinarily one of fact for the jury.
>
> Viewing the evidence, and any reasonable inferences that may be drawn therefrom, in the light most favorable to [the] defendant, the evidence before the trial court on [the] plaintiff's] partial summary judgment motion [seeking a ruling that the defendant's limitation of warranties did not apply against the plaintiff] indicated . . . [that the] plaintiff had a copy of [the] defendant's catalog, which included the limited warranty . . . [and] it was a reference to this catalog that prompted [the] plaintiff's [employee] to contact [the] defendant for a quotation on the [allegedly defective product] at issue in this case. In response to [that] call, [the] defendant's president . . . faxed [the] plaintiff a quotation and, in addition, mailed to [the] plaintiff an updated catalog which also contained the limited warranty. . . .
>
> This evidence establishes a genuinely disputed issue of fact as to whether [the] plaintiff possessed or received [the] defendant's catalog containing the limited warranty prior to the sale and whether that information became part of the basis of the parties' agreement. The district court, therefore, erred in determining, as a

matter of law, that the catalog containing the limited
        warranty never became part of the parties' agreement.

LWT, 19 F.3d at 541 (internal citations omitted) (emphasis added).

The facts of LWT differ from this case somewhat, in that Plaintiff

Indura purchased the Subject Valve from a distributor of Defendant

ECII's products rather than directly from Defendant ECII; however,

one of the cases on which the Tenth Circuit relied, Flintkote Co.

v. W.W. Wilkinson, Inc., 220 Va. 564, 260 S.E.2d 229 (1979),

involved a distributor.

        In that case, a subcontractor purchased tiles manufactured by

Flintkote through a distributor and, in connection with the

purchase, obtained a Flintkote publication that contained a

limitation of warranties (which publication the subcontractor

contended he passed on to the contractor, but which publication the

contractor denied receiving).   See id., 220 Va. at 565-66, 260

S.E.2d at 229-30.   The project owner found the subsequent tile-work

unsatisfactory and the contractor incurred costs remedying the

situation; the contractor then sued the subcontractor "for improper

installation of the tile and [the distributor] and Flintkote for

breach of the warranty of merchantability . . . [whereafter the

subcontractor] cross-claimed against Flintkote for breach of

warranty." Id., 220 Va. at 566-67, 260 S.E.2d at 230-31.   The jury

returned verdicts for the contractor and the subcontractor against

Flintkote on their breach of warranty claims and the trial court

rejected Flintkote's efforts to rely on its limitation of

warranties because "there was no evidence of an agreement of the

                              -71-

parties to limit the remedy for a breach of warranty[.]" Id., 220 Va. at 567-68, 260 S.E.2d at 231. The Virginia Supreme Court, however, held that the evidence of the subcontractor's and the contractor's receipt of the publication that contained the limitation of warranties "raise[d] an issue of fact whether [said limitation] became a part of the bargain between the parties . . . [and] that the trial court erred in refusing to submit that issue to the jury." Id., 220 Va. at 569-70, 260 S.E.2d at 232. As a result, the Virginia Supreme Court "reverse[d] the judgment against Flintkote in favor of [the contractor and subcontractor] on their breach of warranty claims and remand[ed] those claims for a new trial." Id., 220 Va. at 570, 260 S.E.2d at 232.

Similarly, in this case, the record contains evidence that Plaintiff Indura identified the Subject Valve by reviewing one of Defendant ECII's catalogs. (See, e.g., Docket Entry 36-5 at 3 (deposition testimony by employee of Plaintiff Indura: "[O]ne of my partners had a catalog from [Defendant ECII] where [the Subject Valve] appeared . . . . We read its description where it said it was used for cryogenic tank systems, high pressure systems. So we saw it in the catalog, and we called the supplier [i.e., the distributor of Defendant ECII's parts in Chile, Imfluid] to see if they had any in stock.").) Moreover, Defendant ECII has come forward with evidence that, as of August 2007, it had a catalog in which the Subject Valve appears that also encompasses its "Limited Warranty and Limitation of Liability." (See Docket Entry 31-11 at 3 ("This catalog has been updated in August 2007 to include new and

improved products."), 16 (listing, inter alia, "Part Number . . . BK8508T"), 41 (setting forth "Limited Warranty and Limitation of Liability").) In light of LWT and Flintkote (and in the absence of any citation of contrary authority or presentation of persuasive argument from Plaintiff Indura), the Court should reject Plaintiff Indura's position that, as a matter of law, Defendant ECII cannot rely on its "Limited Warranty and Limitation of Liability" to defend against Plaintiff Indura's breach of warranty claims.[30]

At the same time, however, the Court should decline to enter summary judgment for Defendant ECII based on its "Limited Warranty and Limitation of Liability" for at least two reasons. First, substantial authority indicates that "[t]he question of whether the catalog containing the limited warranty became a part of the parties' bargain is ordinarily one of fact for the jury." LWT, 19 F.3d at 541. Second, although (as documented above, see supra, pp. 72-73) the record reflects that Plaintiff Indura reviewed a catalog

---

[30] In particular, Plaintiff Indura's argument concerning the alleged absence of evidence that it "ever reviewed the limitation language" lacks relevance because "[a] [d]efendant need not establish that [the] plaintiff had actual knowledge of the limited warranty," LWT, 19 F.3d at 541. Instead, Defendant ECII need only show that Plaintiff Indura "received the catalog and had an opportunity to read the warranty prior to or at the time of the sale," id. (internal citations omitted). Additionally, as noted above (see supra, pp. 67-68), Plaintiff Indura has asserted that its communications with Defendant ECII's distributor about the Subject Valve created an express warranty and an implied warranty of fitness for a particular purpose, both of which Plaintiff Indura may enforce against Defendant ECII. Given that position (i.e., that the distributor and Defendant ECII are one-and-the-same for purposes of establishing warranties), Plaintiff Indura cannot credibly maintain that written warranty policies adopted by Defendant ECII as to which Plaintiff Indura may have had constructive knowledge (through its consultation of Defendant ECII's catalog) fail to apply in this case simply because Plaintiff Indura purchased the Subject Valve through Defendant ECII's distributor rather than directly from Defendant ECII.

depicting the Subject Valve _and_ that, around the same time, Defendant ECII had a catalog in which both the Subject Valve and the "Limited Warranty and Limitation of Liability" appeared, said evidence does not conclusively establish that the catalog Plaintiff Indura consulted actually included the "Limited Warranty and Limitation of Liability." The fact-finder must resolve that issue.

Finally, the parties disagree about both the substance and significance of record evidence as to communications between Plaintiff Indura and the distributor prior to the purchase of the Subject Valve. According to Plaintiff Indura, "the evidence of record [reflects] that when [Plaintiff] Indura selected the [Subject] [V]alve for purchase from [Defendant] ECII's authorized Chilean distributor, Imfluid, the distributor specifically recommended and approved this particular [type of] valve for this particular application [i.e., use in Trusal's oxygenation system] . . . [thereby creating] a jury question [as to] whether [Defendant] ECII, through the acts of its authorized agent and distributor, is liable for breach of express warranty and/or warranty of fitness for a particular purpose." (Docket Entry 36 at 17 (citing Docket Entry 36-5 at 3-6).) By way of reply, Defendant ECII has asserted that Plaintiff Indura "misstate[d]" and "misconstrue[d]" the testimony in question. (Docket Entry 37 at 8 n.8 (citing Docket Entry 36-5 at 5; Docket Entry 37-2 at 3-4).) In Defendant ECII's view, said evidence conclusively establishes that Plaintiff Indura's employee "simply asked Imfluid if the [Subject] [V]alve could be used in cryogenic application." (_Id._)

A review of all the identified portions of the deposition in question (in the light most favorable to Plaintiff Indura) does not establish conclusively that Plaintiff Indura's employee limited his inquiries to the distributor to whether the Subject Valve would function in a cryogenic application, including as reflected by the portion of the deposition in which Plaintiff Indura's employee testified that, after he "showed [the distributor] the design [for the oxygenation system] . . . [and] the valves that [Plaintiff Indura] was interested in, . . . [he] asked [the distributor] if these valves were appropriate for what [Plaintiff Indura] was doing." (Docket Entry 36-5 at 4.) Because a reasonable fact-finder could construe the foregoing evidence in the manner suggested by Plaintiff Indura, a material question of fact exists as to whether the distributor (acting as Defendant ECII's agent) made statements that created an express warranty or received information sufficient to support a claim for breach of an implied warranty of fitness for a particular purpose. See generally Erection Specialists, Inc. v. Edwards Deutz Diesel, Inc., No. 3:00CV281, 2005 WL 1522104, at *7 (E.D. Tenn. June 28, 2005) (unpublished) ("As an authorized distributor [for the manufacturer], [the distributor] had authority to bind [the manufacturer] to the oral warranty.").[31]

---

[31] Defendant ECII has cited Angola Farm Supply & Equip. Co. v. FMC Corp., 59 N.C. App. 272, 278, 296 S.E.2d 503, 507 (1982), for the proposition that "a manufacturer cannot have knowledge of any particular purpose and the implied warranty therefore does not arise when a third-party, such as a distributor, sells the product." (Docket Entry 31 at 18-19.) Said decision did not
(continued...)

In sum, the existence of numerous material factual questions precludes entry of summary judgment for Defendant ECII on Plaintiff Indura's breach of warranty claims.

*Adequacy of Proof for Contribution/Indemnity*

According to Defendant ECII, absent sufficient proof of "any underlying liability, [Plaintiff] Indura's contribution and indemnity claims necessarily fail." (Docket Entry 31 at 19.) Because (for reasons previously discussed, see supra, pp. 51-55) the record contains adequate evidence to support Plaintiff Indura's negligence-based product liability claim, Defendant ECII's instant challenge to the legal sufficiency of Plaintiff Indura's contribution and indemnity claims falls short.

CONCLUSION

The circumstances do not warrant the striking of the expert reports of Jorquera Encina and Quintana (and the exclusion of their testimony), but do warrant the striking of the rebuttal expert report of Lorenzo (and the exclusion of his testimony). Moreover, given the record evidence (including the expert evidence from Jorquera Encina), Defendant ECII has failed to show that "there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), on

---

[31](...continued)
specifically address whether a distributor ever could bind a manufacturer under agency principles. See Angola Farm, 59 N.C. App. 272, 278, 296 S.E.2d 503, 507. Given the absence of such analysis, the Court should decline to rely on said decision as a basis to grant summary judgment for Defendant ECII at this time; however, the question of exactly what North Carolina agency law would permit in this context may warrant further treatment by the parties before the Court makes any final decision to submit these breach of warranty claims to a jury.

Plaintiff Indura's claims. Nor, under the facts of this case, does the loss of the Subject Valve by Jorquera Encina justify entry of judgment against Plaintiff Indura.

**IT IS THEREFORE ORDERED** that Defendant ECII's Motion to Strike Expert Reports and Opinions (Docket Entry 19) is **DENIED**; however, as alternative sanctions for Plaintiff Indura's failure to make a timely, proper "Disclosure of Expert Testimony":

1) on or before September 16, 2011, Defendant ECII may supplement its own "Disclosure of Expert Testimony" to account for the opinions in the reports of Jorquera Encina and Quintana;

2) Plaintiff Indura shall pay any premium Defendant ECII incurs to obtain such expert analysis and related reporting on an expedited basis;

3) Plaintiff Indura shall reimburse Defendant ECII for the translation of the reports of Jorquera Encina and Quintana;

4) on or before September 16, 2011, Defendant ECII shall serve Plaintiff Indura with a statement of the above-referenced expedited, expert analysis/report preparation fee (if any) and translation costs, as well as any other expenses, including attorney's fees, Defendant ECII incurred due to Plaintiff Indura's failure to make a timely, proper "Disclosure of Expert Testimony";

5) on or before September 30, 2011, Plaintiff Indura shall file a memorandum of not more than ten pages showing cause why it and/or its attorneys should not have to pay any expenses identified by Defendant ECII (other than any expedited, expert analysis/report preparation fee and translation costs, payment of which the Court

already has found appropriate), and, if Plaintiff Indura contests the reasonableness of any such additional expenses, it shall include within its memorandum a certification that it has attempted to confer in good faith with Defendant ECII about that subject;

6) on or before October 14, 2011, Defendant ECII may file a response of not more than ten pages to Plaintiff Indura's foregoing memorandum; and

7) on or before October 21, 2011, Plaintiff Indura may file a reply of not more than five pages to any such response by Defendant ECII.

**IT IS FURTHER ORDERED** that Defendant ECII's Motion to Strike Rebuttal Expert Reports and Opinions (Docket Entry 25) is **GRANTED,** that Lorenzo's report is **STRICKEN,** and that his testimony is **EXCLUDED** as a sanction for Plaintiff Indura's violation of this Court's Local Rule 26.1(c).

**IT IS RECOMMENDED** that Defendant ECII's Motion for Summary Judgment (Docket Entry 30) be **DENIED.**

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

September 1, 2011